472 A.2d 70

COMPTROLLER OF THE TREASURY, INCOME TAX DIVISION et al.

v.

Robert E. HASKIN et al.

COMPTROLLER OF THE TREASURY, INCOME TAX DIVISION

v.

Edouard D. VALETTE

COMPTROLLER OF THE TREASURY, INCOME TAX DIVISION

v.

Earl. L. HEACOCK et ux.

Nos. 65, 66 and 67, Sept. Term, 1983.

Court of Appeals of Maryland.

March 12, 1984.

John K. Barry, Asst. Atty. Gen., Annapolis (Stephen H. Sachs, Atty. Gen., of Baltimore, and Gerald Langbaum, Asst. Atty. Gen., Annapolis, on brief), for appellant.

Charles C. Shelton, Baltimore, (Cynthia L. Leppert and Semmes, Bowen & Semmes, Baltimore, on brief), for Haskin et al.

Edouard D. Valett, in pro. per.

Ronald U. Shaw, Baltimore, (Miles & Stockbridge, Baltimore, on brief), for Heacock et ux.

Marvin J. Garbis and Garbis & Schwait, P.A., Baltimore, Md., John B. Jones, Jr., Joan E. Donoghue and Covington & Burling, Washington, D.C., on brief, for amicus curiae International Business Machines Corp.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

COUCH, Judge.

Each of the cases before us today involves a common issue; therefore, we address them together. The question presented in each is whether a Maryland domiciliary who accepts employment in a foreign country and moves there for an indefinite time, but later returns to Maryland, continues to maintain a Maryland domicile, and is therefore subject to state income taxes for the period of his absence. More simply, the appellant presents us with the question of whether a special test of domicile is appropriate in this situation, or whether the existing test of domicile can be applied validly. As we shall discuss below, we find no authority or justification for altering the test for domicile, and accordingly, we shall affirm each of these cases.

In each case the appellant, Comptroller of the Treasury, made an assessment for income tax against the appellees, Robert and Lois Haskin, Edouard D. Valette, and Earl and Nancy Heacock, for the years of their absence. In each case

the taxpayers appealed to the Maryland Tax Court[1] alleging that they were not domiciled in Maryland during the years assessed. The Tax Court reversed the assessment in each case. In the Haskin case, the Comptroller appealed to the Baltimore City Court (now the Circuit Court for Baltimore City) which reversed the Tax Court. However, upon the taxpayer's appeal to the Court of Special Appeals the circuit court was reversed, and the Tax Court's decision thereby upheld. In the Heacock and Valette cases, the Circuit Court for Anne Arundel County affirmed the Tax Court decisions upon the Comptroller's appeal.[2] We granted certiorari in each case to determine a question of public importance.

## I.

### The Facts

### A.

In the Haskin case the evidence before the Tax Court consisted of Mr. Haskin's testimony and four exhibits introduced by him. In 1977, Mr. Haskin resided in Bel Air, Maryland and worked as an engineering supervisor for Western Electric in Cockeysville, Maryland. He had lived in Bel Air for ten years and he testified that his family and he were restless and anxious to make a move because this was the longest they had stayed in one place since they were married. He also was interested in moving because he was somewhat ambivalent about an upcoming new assignment at Western Electric.

In the summer of 1977 he learned of an opportunity with American Bell International (hereinafter "ABI"), a company formed by AT & T, the parent company of Western Electric, which had secured a contract to upgrade the Iranian telephone system. After discussions with his family, Mr. Haskin

---

1. Such appeals are provided for by Maryland Code (1957, 1980 Repl.Vol., 1983 Cum.Supp.), Article 81, § 309(d).

2. We granted certiorari prior to the Court of Special Appeals' consideration of the Heacock and Valette cases.

took the initiative, applied for and began employment with ABI, and terminated his employment at Western Electric. The ABI contract with Iran was for ten years but the company hoped to gain a permanent contract following that period, and also, considered possibly obtaining similar contracts elsewhere in the Mideast. Mr. Haskin intended to remain as long as a job was there; therefore, his intended length of stay was indefinite.

In preparing to move, the Haskins followed ABI's advice. They rented rather than sold their Maryland home because of tax considerations. They placed their furniture in storage because due to the expense of transporting it, the company would supply furniture in Iran. Also on ABI's advice, the Haskins maintained their bank account in the United States for the depositing of salary checks. They moved before the end of 1977.

Once in Iran the Haskins made efforts to assimilate themselves as permanent residents. Mr. Haskin obtained an unrestricted visa and a residence permit; he obtained an Iranian driver's license giving Iran as his permanent address, and he and his wife allowed their Maryland driver licenses to expire; his wife performed volunteer work at the Red Cross in hopes of obtaining a permanent paid position. She joined two local clubs and they both took language Farsi lessons. In October of 1978, Mr. Haskin returned briefly to the United States with his son because he had discovered marijuana in his son's possession, an offense punishable by death in Iran. He returned to the United States in search of a boarding school for his son, but he was unsuccessful in finding a satisfactory school because the schools required that the family live in the United States for supervision, so they both returned to Iran.

Their stay in Iran ended in January of 1979 when revolutionary turmoil forced all ABI employees to leave the country. Anticipating the political situation, Mr. Haskin had begun seeking positions somewhere with AT & T in the United States in the months before evacuation was forced

because he hoped to avoid returning to Maryland. However, because all ABI employees had to be relocated, the company policy was to return people to their prior location. Western Electric agreed to take back former employees and Mr. Haskin thus returned to his job in Cockeysville.

The Comptroller contended that the Haskins were domiciled in Maryland on December 31, 1978 because their Maryland domicile had never terminated. Therefore, they were subject to Maryland income tax for the year, and the Comptroller assessed them accordingly.

B.

In the Valette case, Mr. Valette's testimony was the only evidence before the Tax Court. He testified that he had become accustomed to moving every few years. He had lived in Maryland since 1960 but had changed homes three times within Maryland between that time and 1973. He was employed as an engineer by Westinghouse in Cockeysville, Maryland. In early 1974 he accepted a new position with Westinghouse in Iran which involved establishing an environmental laboratory for Iran Electric. Westinghouse stated that the assignment was permanent and that no provision was made for reemployment with the company upon his return.

Mr. Valette testified to several reasons which precipitated the family's move. First, during 1973 the family was occupied with difficulties with a builder in remodeling an old home that they had bought and planned to move to. Mr. Valette described the experience as one of extreme hardship and mental anguish. The family members therefore viewed the opportunity as a way to provide a needed change in their lives from this unhappy experience. Further they viewed the move as an educational experience for the three children, an opportunity to travel, and a financial opportunity.

In preparing for the move the Valettes rented their house, rather than selling it, because of tax considerations. On the company's advice they maintained a bank account in the

United States for the deposit of paychecks, and they also used the account for the agent to deposit rental payments from the house. They sold their boat and one of their cars; stored another car with his parents in Illinois; and gave his father power of attorney over his stocks and bonds. The company paid only for moving essential items overseas, requiring the Valettes to spend money in addition to the company stipend to move. They stored their remaining furniture, rather than selling it, because the company paid for storage.

In Iran, the Valettes rented a home since foreigners cannot purchase property. The children were enrolled in school and Mr. Valette paid tuition. He opened a bank account, bought an automobile and a Moped, and obtained an international driver's license. The family became active in the church and Mr. Valette participated in and organized prayer group meetings and church functions. Mrs. Valette worked teaching English to Iranian employees. They both took lessons in the Iranian language, and Mr. Valette became fluent. Mr. Valette joined several clubs and made Iranian friends.

The situation changed when the Iranian government took over management of the English speaking school which the children attended, which brought about mismanagement and deterioration of the school. Mr. Valette testified that because of the importance of the children's education and their lack of options to affect the situation, they decided to return to the United States.

Initially, they went to his parents' home in Illinois but, after a brief visit, returned to Maryland and soon moved into their house which they had been renting. Mr. Valette returned to Iran for seven more months to complete work, but he declined an opportunity to remain for another year because he wanted to rejoin his family. Westinghouse offered him positions in several locations, and he chose to return to Cockeysville.

We note that the Valettes did not vote during the period and their voting registration in Maryland lapsed. Mr. Valette, on company instructions, maintained his driver's license for business reasons but Mrs. Valette's license expired.

The Comptroller assessed Maryland income taxes against Mr. Valette for 1974 through 1977.

## C.

In the Heacock case the record shows that the family moved to Maryland in 1962 when Mr. Heacock was employed by the federal government. In 1969, Mr. Heacock accepted an employment opportunity as an electronics engineer with the European Space Research Organization, known as "ESRO," in Holland. He resigned from his position with the federal government and rejected the government's offer of a three year leave of absence, the length of his contract with ESRO, because he was eligible for contract renewals.

In preparing to move to Holland the Heacocks closed all their Maryland bank accounts and opened an account in Illinois. They rented their two residences in Bowie, Maryland, one of which had been their home, as investments. They hired a Virginia real estate agent to manage the properties and opened a bank account in Virginia to be used for the receipts and expenses of the properties. Mr. Heacock withdrew all funds from his federal government pension and they moved all their family possessions, including a car, to Holland.

While in Holland the Heacocks joined local churches, took language lessons, and enrolled the children in Dutch speaking schools. In 1972, Mr. Heacock applied for and received a promotion with ESRO that required them to move to France. The children were enrolled in French speaking schools, and during this time they gave serious thought to remaining permanently. The Heacocks bought several cars while in Europe, none of which met U.S. safety specifications and could not be used in the United States without modifications. When they ultimately returned to the United

States, they brought back a Mercedes-Benz, but they then had to spend several thousand dollars modifying it to meet safety standards. In 1975 they returned to Illinois for a vacation. During this time they purchased part of his uncle's farm and also executed new wills. The wills extinguished earlier Maryland wills and they attempted to conform the wills to both Illinois and French law. The wills were filed in Illinois but did specify that they were residents of France.

The Heacocks return to the United States was precipitated by a change in ESRO employment policy. When his contract was renewed at the end of 1975 he learned that most employees would receive career contracts as distinguished from the fixed term contract that had been used for everyone until then and which he was given again. He was not eligible for a career contract because he was not from a ESRO member nation. Because the policy change caused him concern about his future job security, he changed his mind about remaining in Europe and began seeking employment in the United States.

Mr. Heacock accepted a position with the federal government and returned to the United States in October of 1976. They initially sought housing in northern Virginia but ultimately found and purchased a house in Annapolis. We note finally that their youngest child, a third grader, could not read or write English at the time of their return. Mrs. Heacock testified that they did not work with him in reading or writing English because they did not anticipate returning to the United States.

The Heacocks were assessed resident state income tax for 1973 through 1976.

## II.

Article 81 of the Maryland Code provides that final orders of the Tax Court may be appealed to a circuit court. Maryland Code (1957, 1980 Repl.Vol., 1983 Cum.Supp.), Article 81, § 229(*1*). Section 229 further provides that "[t]he circuit

court shall affirm the Tax Court order if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record." Article 81, § 229(o). Because the Comptroller argues that the Tax Court decisions were erroneous as a matter of law, we will first consider that question. We, however, reject the Comptroller's argument.

The issue of law in these cases focuses on the requisite test for domicile. If the appellees were domiciled in Maryland on the last day of the taxable year they are subject to Maryland income tax as residents of the state. Maryland Code (1957, 1980 Repl.Vol.), Article 81, §§ 279(i), 288(a). The question of domicile, therefore, is determinative.

In *Shenton v. Abbott,* 178 Md. 526, 15 A.2d 906 (1940), we set out the meaning of domicile.

"A person's domicile is the place with which he has a settled connection for legal purposes, either because his home is there or because that place is assigned to him by the law. It is well defined as that place where a man has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he has, whenever he is absent, the intention of returning. While a person may have several residences, he can have only one domicile at a time. . . .

It is a fundamental rule that, in order to effect a change of domicile, there must be an actual removal to another habitation, coupled with an intention of remaining there permanently or at least for an unlimited time. But a change of residence, to enable a person to perform the duties of a civil office, whether elective or appointive, does not of itself constitute a change of domicile. No temporary residence, whether for the purposes of business, health, or pleasure, occasions a change of domicile. Even though a person may be absent from his domicile for many years, and may return only at long intervals, nevertheless he retains his domicile if he does not acquire a domicile elsewhere. . . . 'The essential fact that raises a

change of abode to a change of domicile is the absence of any intention to live elsewhere. [ . . . ]' *Williams[on] v. Osenton,* 232 U.S. 619, [624,] 34 S.Ct. 442, 443, 58 L.Ed. 758, [761 (1914) (Holmes, J.)]"

178 Md. at 530–31, 15 A.2d at 908. The test, therefore, is two-fold: "in order to establish a change of domicile, it must 'be shown not only that a new residence was acquired with the intention of remaining there, but also an abandonment of the old domicile so permanent as to exclude the existence of an intention to return to the former place." *Id.* at 534, 15 A.2d at 909–10.

■ The controlling factor in determining a person's domicile is his intent. *Dorf v. Skolnik,* 280 Md. 101, 116, 371 A.2d 1094, 1102 (1977). Intent is best shown by objective factors, the two most important factors being where a person actually lives and where he votes. *Id.* at 117, 371 A.2d at 1102–03. A number of other factors might be weighed in deciding a person's domicile. *Id.; see Toll v. Moreno,* 284 Md. 425, 444, 397 A.2d 1009, 1018 (1979); *see also Bainum v. Kalen,* 272 Md. 490, 499, 325 A.2d 392, 397 (1974) (other factors). No single circumstance has ever been deemed conclusive. *Dorf v. Skolnik,* 280 Md. at 117, 371 A.2d at 1102; *Toll v. Moreno,* 284 Md. at 443, 397 A.2d at 1018. Domicile by its very nature depends upon one's intent as objectively shown by a multitude of factors associated with that particular individual. *Toll v. Moreno,* 284 Md. at 442, 397 A.2d at 1017. Finally, we note that in *Toll* we held that domicile is a unitary concept in Maryland. *Id.* at 441, 397 A.2d at 1017. Although the rules for determining domicile may be applied differently in a particular case, the thrust thereof is to get the best indication of intent. "However, such differences in applying the principles of domicile do not depend upon, or vary with, the purpose for ascertaining domicile or the type of case involved." *Id.*

The Comptroller contends that the Tax Court erred as a matter of law because the results in these cases cannot stand in light of *Shenton v. Abbott* and *Toll v. Moreno.* The Comptroller argues that because each of the appellees was

certain to return from his job overseas, he could not establish a new domicile in the foreign country and his old domicile could not be terminated by his absence; therefore, they each remained Maryland domiciliaries throughout. The Comptroller's argument follows from a view of each appellee's move as merely a temporary job transfer with an international corporate employer. The Comptroller contends that only the length of each appellee's stay was indefinite and that each appellee nevertheless was certain to return.

We reject the Comptroller's argument that the results in the Tax Court were erroneous as a matter of law. We would agree that if an individual possesses a certain intention to return he does not terminate his domicile because he does not intend to establish a new domicile in the place of his new abode. However, this question of intent is a question of fact for each particular case. The Comptroller would have us assume this fact as a matter of law in cases fitting this scenario. We decline to do so. Intentions cannot be assumed merely because the move is connected with employment. In Maryland, domicile is a unitary concept, the context is irrelevant to the issue, and it is to be resolved upon intent in the particular case. Because employment is a necessary consideration, the converse of the Comptroller's view can be equally valid, that is, that employment is sought because the individual seeks to change his domicile. The factual distinctions in comparing the Heacock case to the Valette and Haskin cases exemplify the difficulties of the Comptroller's approach. If a certain intention to return is established as a matter of fact, then the rule of *Shenton* and *Toll* applies and the intended domicile controls.

The Comptroller relies upon the Court of Special Appeals' decision in *Comptroller v. Mollard,* 53 Md.App. 631, 455 A.2d 72 (1983), in which the Comptroller prevailed. In *Mollard,* domicile was at issue for tax purposes where a Maryland resident accepted a position with ITT, his employer, in Belgium, for nearly two years and then returned. In that

case that court held there was a certain intention to return to the United States, although not to Maryland; therefore, because he could not establish a new domicile his old domicile in Maryland continued. Although his intention to remain in Belgium was indefinite, the court found that he did not meet the further requirement of *Shenton* that he intend to establish Belgium as his fixed present domicile. The court's holding that Mr. Mollard had a certain intent to return, however, does not support the Comptroller's contention that such an intent should be assumed in all such similar cases. Intent is a factual question for each case.

The Comptroller additionally suggests that the determination of domicile should not depend solely on the taxpayer's testimony of his intent to remain indefinitely. The Comptroller would have us require objective factors independent of employment such as seeking immigrant status, or marrying a foreign national. These suggestions are an attempt to have us create a special rule for this situation. We have explained that this would be inconsistent with the law as it now stands. Although such factors would provide strong and obvious evidence of a new domicile, it is not required.

Having determined that the Tax Court did not err as a matter of law, all that remains for our consideration is whether the decisions were supported by substantial evidence. Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *See Bulluck v. Pelham Woods Apartments,* 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978) (quoting *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 448, 168 A.2d 390, 392 (1961) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938)). In *Bulluck v. Pelham Woods Apartments,* we said:

> "In applying the substantial evidence test, we have emphasized that a 'court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken." *Bernstein v. Real Estate Comm.,* 221 Md. 221, 230, 156 A.2d 657 (1959), *appeal dismissed,* 363 U.S. 419, 80 S.Ct.

1257, 4 L.Ed.2d 1515 (1960). We also must review the agency's decision in the light most favorable to the agency, since 'decisions of administrative agencies are prima facie correct,' *Hoyt v. Police Comm'r,* 279 Md. 74, 88–89, 367 A.2d 924 (1977), and "carry with them the presumption of validity,' *Dickinson-Tidewater, Inc. v. Supervisor, supra,* 273 Md. [245] at 256 [329 A.2d 18]; *Heaps v. Cobb,* 185 Md. 372, 378, 45 A.2d 73 (1945). Furthermore, not only is it the province of the agency to resolve conflicting evidence but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences. *Labor Board v. Nevada Consolidated Copper Corp.,* 316 U.S. 105, 106–107, 62 S.Ct. 960 [961], 86 L.Ed. 1305 (1942); *Board v. Levitt & Sons,* 235 Md. 151, 159–160, 200 A.2d 670 (1964); *Snowden v. Mayor & C.C. of Balto., supra,* 224 Md. [443] at 448 [168 A.2d 390]."

283 Md. at 513, 390 A.2d at 1124, *quoted with approval in Courtney v. Board of Trustees,* 285 Md. 356, 402 A.2d 885 (1978); *see also Supervisor of Assessments of Howard County v. Carroll,* 298 Md. 311, 469 A.2d 858 (1983).

■ Although the Comptroller pointed to continuing contacts in Maryland in arguing that the Tax Court had erred as a matter of law, the Comptroller does not argue alternatively that the decisions are unsupported by substantial evidence. The record is supported by substantial evidence as we have indicated in reviewing the facts. There is substantial evidence in each case that the appellee did not intend to return to Maryland, intended to remain in their new domicile indefinitely, and returned only upon the occurrence of unanticipated events. Furthermore, determination of domicile is at bottom a determination of an individual's intent which is appropriately left to the factfinder. Having reviewed the records in each case, and in view of the limited nature of review for substantial evidence, we are convinced that the decision in each case is supported by substantial evidence and must be affirmed.

IN *COMPTROLLER V. HASKIN,* JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.

IN *COMPTROLLER V. VALETTE* AND *COMPTROL-LER V. HEACOCK,* JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.