718 A.2d 1111

**Clarence W. BLOUNT et al.**

v.

**Frank D. BOSTON, Jr.**

**No. 90, Sept. Term, 1998.**

Court of Appeals of Maryland.

September 1, 1998.

Subsequent Opinion October 6, 1998.

George L. Russell, Jr. (George A. Nilson, Anthony P. Ashton, Piper & Marbury, on brief), Baltimore, for appellants.

Steven A. Allen, Una M. Perez (Hodes, Ulman, Pessin & Katz, P.A., on brief), Towson, for appellee.

Argued before Bell, C.J., ELDRIDGE, RODOWSKY, RAKER, WILNER and CATHELL, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

PER CURIAM ORDER.

For reasons to be stated in an opinion later to be filed, it is this 1st day of September, 1998,

ORDERED, by the Court of Appeals of Maryland, that the judgment of the Circuit Court for Anne Arundel County is reversed; mandate to issue forthwith; costs to be paid by appellee.

ELDRIDGE, Judge.

The legal issue in this case is whether a long-time member of the Maryland General Assembly, who is a candidate for re-election, has abandoned his domicile in the Baltimore City legislative district which he has been representing and established a new domicile in Baltimore County.

The defendant-appellant, Senator Clarence W. Blount, was a candidate for the Democratic Party nomination at the primary

election held on September 15, 1998, and is a candidate for re-election at the November 1998 general election, to the Maryland Senate, representing the 41st legislative district located entirely within Baltimore City. The plaintiff-appellee, Frank D. Boston, Jr., was running against Senator Blount in the primary election for the nomination of the Democratic Party for State Senator from the 41st district. The plaintiff-appellee brought this action in the Circuit Court for Anne Arundel County to have Senator Blount's name stricken from the primary election ballot, contending that Senator Blount did not meet the Constitutional residency requirements to represent the 41st legislative district. After a trial, the circuit court on August 26, 1998, held that Senator Blount was not eligible to serve as a Senator representing the 41st legislative district, and the court ordered that his name be removed from the primary election ballot. An immediate appeal was taken, and this Court, on August 27, 1998, issued a writ of certiorari. After oral argument before this Court on September 1, 1998, we issued an order reversing the judgment of the circuit court. We now state our reasons for that order.

## I.

Before recounting the particular facts of this case, it would be helpful to set forth the well-settled principles of Maryland law which govern cases of this nature.

Article III, § 9, of the Maryland Constitution requires that, to be eligible to serve as a member of the General Assembly, a person must have "resided" in the legislative district which he or she has been chosen to represent for at least six months prior to the election or, if the district has not been established for six months, for as long as it has been established.[1] As

---

1. Article III, § 9, of the Maryland Constitution states in its entirety as follows:
 **"Section 9. Age, citizenship and residence requirements for Senators and Delegates.**
 "A person is eligible to serve as a Senator or Delegate, who on the date of his election, (1) is a citizen of the State of Maryland, (2) has resided therein for at least one year next preceding that date, and (3) if the district which he has been chosen to represent has been established for at least six months prior to the date of his election, has resided in that district for six months next preceding that date.

recently pointed out in *Roberts v. Lakin,* 340 Md. 147, 153, 665 A.2d 1024, 1026 (1995), "[t]his Court has expressly held that the word 'resided' in Article III, § 9, means 'domiciled.'"

The Court in *Bainum v. Kalen,* 272 Md. 490, 496, 325 A.2d 392, 395–396 (1974), addressed and rejected an argument that the term "resided" in Article III, § 9, of the Constitution referred to actual physical abode instead of domicile, saying:

"Preliminarily, a question has been raised in this case concerning the meaning of the term 'resided' in Article III, Section 9, of the Maryland Constitution. It is suggested that the word 'reside' or its equivalent, as used in constitutional or statutory provisions setting forth qualifications for political office or voting, means actual physical presence or abode rather than domicile. Some language in the opinion in *Shaeffer v. Gilbert,* 73 Md. 66, 70–71, 20 A. 434 (1890), arguably supports the distinction. However, to the extent that it does, the language from the *Shaeffer* case was specifically disapproved by this Court in *Gallagher v. Bd. of Elections,* 219 Md. 192, 206, 148 A.2d 390 (1959).

"From *Thomas v. Warner,* 83 Md. 14, 20, 34 A. 830 (1896), and *Howard v. Skinner,* 87 Md. 556, 559, 40 A. 379 (1898), until the present, this Court has consistently held that the words 'reside' or 'resident' in a constitutional provision or statute delineating rights, duties, obligations, privileges, etc., would be construed to mean 'domicile' unless a contrary intent be shown. Thus, our predecessors stated in *Howard v. Skinner, supra,* 87 Md. at 559 [40 A. 379]: 'Residence, as contemplated by the framers of our Constitution, for political or voting purposes, means *a place of fixed present domicile.*'"

---

"If the district which the person has been chosen to represent has been established less than six months prior to the date of his election, then in addition to (1) and (2) above, he shall have resided in the district for as long as it has been established.

"A person is eligible to serve as a Senator, if he has attained the age of twenty-five years, or as a Delegate, if he has attained the age of twenty-one years, on the date of his election. (1974, ch. 880, ratified Nov. 5, 1974; 1977, ch. 681, ratified Nov. 7, 1978.)"

*See also, e.g., Garcia v. Angulo,* 335 Md. 475, 477, 644 A.2d 498, 499 (1994) (" 'resident of this State' in the [statute] . . . means a domiciliary of Maryland"); *Wamsley v. Wamsley,* 333 Md. 454, 458, 635 A.2d 1322, 1324 (1994) ("We have held consistently that 'the words "reside" or "resident" in a constitutional provision or statute delineating rights, duties, obligations, privileges, etc. would be construed to mean "domicile" unless a contrary intent is shown' "); *Dorf v. Skolnik,* 280 Md. 101, 116, 371 A.2d 1094, 1102 (1977) ("the words 'reside' or 'resident' [with regard to members of a party central committee] mean 'domicile' "); *Hawks v. Gottschall,* 241 Md. 147, 149, 215 A.2d 745, 746 (1966) (" 'a resident of this State' as used in the [statute] . . . means a person who has acquired a domiciliary status in the State of Maryland"); *Maddy v. Jones,* 230 Md. 172, 178–179, 186 A.2d 482, 485 (1962) ("the Maryland decisions have given the term 'residence', for political or voting purposes, the legal significance of 'domicile' "); *Gallagher v. Bd. of Elections,* 219 Md. 192, 207, 148 A.2d 390, 398–399 (1959) (with respect to the requirement in the Baltimore City Charter that a candidate for Mayor be a resident of Baltimore City for ten years preceding the election, the Court concluded "that the framers of the Charter intended the residence required . . . to be the equivalent of a 'present, fixed domicile' " and that it does not mean "an actual and physical residence"); *Rasin v. Leaverton,* 181 Md. 91, 93, 28 A.2d 612, 613 (1942) ("The requirement in the Constitution of residence for political or voting purposes is one of a place of fixed, present domicile"); *Wagner v. Scurlock,* 166 Md. 284, 291, 170 A. 539, 542 (1934) (residence in statute means domicile); *Howard v. Skinner,* 87 Md. 556, 559, 40 A. 379, 380 (1898) ("Residence, as contemplated by the framers of our Constitution, for political or voting purposes, means *a place of fixed present domicile* ").

■ Consequently, any inquiry into whether a member of or candidate for the Maryland General Assembly meets the "residency" requirements set forth in Article III, § 9, must focus upon the member's or candidate's domicile.

The concept of domicile is somewhat elusive, and there is no single definition of the term which will mechanically determine each person's domicile once the pertinent facts are known. One's domicile "has been defined as the place 'with which he has a settled connection for legal purposes,'" *Bainum v. Kalen, supra,* 272 Md. at 497, 325 A.2d at 396, quoting *Shenton v. Abbott,* 178 Md. 526, 530, 15 A.2d 906, 908 (1940). It has also been defined, in the same judicial opinions,

"as that place where a man [or woman] has his [or her] true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he [or she] has, whenever . . . absent, the intention of returning." *Shenton v. Abbott, supra,* 178 Md. at 530, 15 A.2d at 908.

In addition, domicile has been defined as the place that is "the 'centre of [a person's] affairs,' and the place where the business of his life [is] transacted." *Thomas v. Warner,* 83 Md. 14, 20, 34 A. 830, 831 (1896). A person's domicile is ordinarily "where he and his family habitually dwell," *ibid.* One claiming a particular place as his domicile "identifies himself and all his interests" with the place and there "exercises the rights and performs the duties of a citizen." *Ibid.*

Although a person may have several places of abode or dwelling, he or she "'can have only one domicile at a time.'" *Bainum,* 272 Md. at 497, 325 A.2d at 396, quoting *Shenton v. Abbott, supra,* 178 Md. at 530, 15 A.2d at 908. Furthermore, under Maryland law, domicile is a unitary concept; the "meaning of domicile and the basic principles for determining domicile have been the same in this State regardless of the context in which the issue of domicile arose." *Toll v. Moreno,* 284 Md. 425, 438, 397 A.2d 1009, 1015 (1979).

For the substantial majority of Marylanders, there is little or no question about their domicile. Typically, such person has only one place of abode which is designated as his or her residence for virtually all purposes, such as voting, income tax returns, driver's license, motor vehicle registration, school attendance, receipt of mail, banking, contracts and legal docu-

ments, the keeping of personal belongings, membership in organizations, etc. That place clearly constitutes his or her domicile. The difficult and close cases arise with respect to those persons who have more than one place of abode or who have other significant contacts with more than one place.

This Court has held on numerous occasions that the "controlling factor in determining a person's domicile is his intent. One's domicile, generally, is that place where he intends it to be." *Bainum,* 272 Md. at 497, 325 A.2d at 396. *See, e.g., Garcia v. Angulo, supra,* 335 Md. at 487, 644 A.2d at 504; *Comptroller v. Haskin,* 298 Md. 681, 691, 472 A.2d 70, 75 (1984); *Toll v. Moreno, supra,* 284 Md. at 443, 397 A.2d at 1018; *Dorf v. Skolnik, supra,* 280 Md. at 116–117, 371 A.2d at 1102; *Gallagher v. Bd. of Elections, supra,* 219 Md. at 208, 148 A.2d at 399; *Wagner v. Scurlock, supra,* 166 Md. at 292, 170 A. at 542 ("practically all of the decisions say intention is the controlling factor").

 A person's statements of his or her intent as to domicile are admissible and should be considered. *Comptroller v. Haskin, supra,* 298 Md. at 693, 472 A.2d at 76; *Gallagher v. Bd. of Elections, supra,* 219 Md. at 198, 148 A.2d at 393; *Wagner v. Scurlock, supra,* 166 Md. at 290–292, 170 A. at 541–542; *Harrison v. Harrison,* 117 Md. 607, 614–616, 84 A. 57, 59–60 (1912). Nevertheless, as the cases repeatedly point out, "that intent may . . . be more satisfactorily shown by the acts of the individual, rather than by his words." *Harrison v. Harrison, supra,* 117 Md. at 614, 84 A. at 59. Intent "is best shown by objective factors," *Comptroller v. Haskin, supra,* 298 Md. at 691, 472 A.2d at 75. *See also, e.g., Garcia v. Angulo, supra,* 335 Md. at 487, 644 A.2d at 504; *Wamsley v. Wamsley, supra,* 333 Md. at 459, 461, 635 A.2d at 1324–1325; *Toll v. Moreno, supra,* 284 Md. at 442, 397 A.2d at 1017; *Dorf v. Skolnik, supra,* 280 Md. at 117, 371 A.2d at 1102; *Bainum,* 272 Md. at 497, 325 A.2d at 396; *Wagner v. Scurlock, supra,* 166 Md. at 292, 170 A. at 542.

 The two most significant objective factors evidencing a person's intent regarding domicile are where the person

lives and where he or she votes or is registered to vote. *Bainum,* 272 Md. at 498, 325 A.2d at 397 ("the two most important elements in determining domicile are where a person actually lives and where he votes"). Our cases have characterized the place of voting as " 'the highest evidence of domicile,' " *Wagner v. Scurlock, supra,* 166 Md. at 292, 170 A. at 542. *See Roberts v. Lakin, supra,* 340 Md. at 154, 665 A.2d at 1027 (" 'Evidence that a person registered or voted is ... ordinarily persuasive when the question of domicile is at issue,' " quoting *Comptroller v. Lenderking, supra,* 268 Md. at 619, 303 A.2d at 405). Actual residence in a place, coupled with voter registration in that place, "clearly create[s] a presumption that [the person] was domiciled" there. *Roberts v. Lakin, supra,* 340 Md. at 155, 665 A.2d at 1028. *See Bainum,* 272 Md. at 498–499, 325 A.2d at 397 ("Where the evidence relating to voting and the evidence concerning where a person actually lives both clearly point to the same jurisdiction, it is likely that such place will be deemed to constitute the individual's domicile"); *Comptroller v. Lenderking,* 268 Md. 613, 619, 303 A.2d 402, 405 (1973) ("The act of registering [to vote], taken together with the fact that Mr. Lenderking lived ... in Maryland ..., gives rise to a rebuttable presumption that he was domiciled in Maryland").

Although actual residence and voting have been considered the most important objective circumstances indicating domicile, numerous other factors are also pertinent to show a person's intent. As this Court explained in the *Bainum* case, 272 Md. at 499, 325 A.2d at 397, where actual residence and/or place of voting

"are not so clear, or where there are special circumstances explaining a particular place of abode or place of voting, this Court will look to and weigh a myriad of other factors in deciding a person's domicile. These include such things as: the paying of taxes and statements on tax returns; the ownership of property; where the person's children attend school; the address at which one receives mail; statements as to residency contained in contracts or other documents; statements on licenses or governmental documents; where

furniture and other personal belongings are kept; which jurisdiction's banks are utilized; membership in professional, fraternal, religious or social organizations; where one's regular physicians and dentists are located; where one maintains charge accounts; and any other facts revealing contact with one or the other jurisdiction. *See Gallagher v. Bd. of Elections, supra,* 219 Md. at 196–198 [148 A.2d 390]."

Although, as pointed out earlier, domicile is a unitary concept and the same legal principles apply regardless of the context, *Toll v. Moreno, supra,* nonetheless the importance or weight to be given some factors or contacts will vary depending upon the circumstances. Thus, where the issue is which of two areas constitutes a person's domicile, and the areas are relatively far apart, factors such as which area's banks, stores, professional services, schools, organizations, churches, etc. are utilized may be quite important to show the individual's intent. Where the two areas in dispute are relatively close to each other, however, which area's banks, stores, professional services, etc. are utilized has little probative value in determining domiciliary intent. People today regularly travel quite a few miles to the banks, stores, shopping centers, and professional offices of their choice. Nevertheless, even where the dispute concerns two dwellings close to each other, while the banks, stores, etc. that are utilized may have little significance, which of the two addresses is listed with the banks, stores, etc. may be of some significance.

Moreover, "this Court has never deemed any single circumstance conclusive," *Bainum,* 272 Md. at 498, 325 A.2d at 397, including place of voting or abode. *See Toll v. Moreno, supra,* 284 Md. at 443–444, 397 A.2d at 1018 ("no one circumstance will render a person incapable of establishing a ... domicile [in a particular place]. Instead, all of the factors relating to the different jurisdictions in question must be examined and weighed"). There have been cases holding that persons were domiciled in places in which they neither actually lived nor voted during the relevant periods. *See Gallagher v. Bd. of Elections, supra,* 219 Md. at 196–199, 148 A.2d at 392–394; *Howard v. Skinner, supra,* 87 Md. 556, 40 A. 379; *Jones v.*

*Skinner,* 87 Md. 560, 40 A. 381 (1898). Numerous other cases have held that persons were domiciled in particular jurisdictions even though they did not actually live in those jurisdictions during the relevant time periods. *See, e.g., Wamsley v. Wamsley, supra,* 333 Md. at 463–464, 635 A.2d at 1326–1327; *Comptroller v. Lenderking, supra,* 268 Md. at 614–615, 620, 303 A.2d at 403, 406; *Hawks v. Gottschall, supra,* 241 Md. at 149–151, 215 A.2d at 746–748; *Walsh, Administrator v. Crouse,* 232 Md. 386, 194 A.2d 107 (1963); *Maddy v. Jones, supra,* 230 Md. 172, 186 A.2d 482, *Hall v. Morris,* 213 Md. 396, 404–406, 132 A.2d 113, 117–119 (1957); *Walker v. Walker,* 125 Md. 649, 94 A. 346 (1915).

■ When a person had clearly established his or her domicile in a particular geographical area, and the issue before the Court is whether that person has abandoned such domicile and acquired a new one, additional legal principles become pertinent. Thus, once a person's place of domicile is determined, there is a presumption that it continues, and the "person retains his domicile there unless the evidence affirmatively shows an abandonment of that domicile" and the acquisition of "a new one," *Bainum,* 272 Md. at 498, 325 A.2d at 396–397. *See, e.g., Roberts v. Lakin, supra,* 340 Md. at 154, 665 A.2d at 1027; *Wamsley v. Wamsley, supra,* 333 Md. at 461, 635 A.2d at 1325; *Dorf v. Skolnik, supra,* 280 Md. at 117, 371 A.2d at 1102; *Hawks v. Gottschall, supra,* 241 Md. at 152, 215 A.2d at 748; *Turner v. Crosby,* 85 Md. 178, 180, 36 A. 760, 760–761 (1897); *Thomas v. Warner, supra,* 83 Md. at 19–20, 34 A. at 831.

Even when an individual leaves the area in which he had established a domicile, that area remains his domicile until a new one is clearly established. *Comptroller v. Lenderking, supra,* 268 Md. at 620, 303 A.2d at 406 ("When he left Maryland, even with the intention of not returning, Maryland remained his domicile until he acquired a new one"); *Shenton v. Abbott, supra,* 178 Md. at 530, 15 A.2d at 908 ("Even though a person may be absent from his domicile for many years, . . .

nevertheless he retains his domicile if he does not acquire a domicile elsewhere").

In order to effect a change of domicile, " 'there must be an actual removal to another habitation, coupled with an intention,' " *Bainum*, 272 Md. at 498, 325 A.2d at 397, quoting *Shenton v. Abbott, supra,* 178 Md. at 530, 15 A.2d at 908. Or, as this Court explained on an earlier occasion, "[t]he mere intention to acquire a new domicil without the fact of an actual removal avails ·nothing, neither does the fact of a removal without the intention." *Ringgold v. Barley,* 5 Md. 186, 193 (1853).

There are two aspects of the intent element which are pre-requisites for a change of domicile.

*First,* the person must intend to abandon his or her former domicile. "When one takes up a new residence, in order to avail himself of the rights which such change of domicile confers, it must be not so much with the intention of there remaining, but of the abandonment of his former domicile," *Wagner v. Scurlock, supra,* 166 Md. at 292–293, 170 A. at 542. *See also, e.g., Wamsley v. Wamsley, supra,* 333 Md. at 461, 635 A.2d at 1325 (an "individual's domicile will continue . . . unless the facts of a given case establish an intent to abandon that domicile"); *Gallagher v. Bd. of Elections, supra,* 219 Md. at 208, 148 A.2d at 399 ("As Governor McKeldin did not intend to abandon his domicile in Baltimore City while living as governor in Annapolis, his domicile remained . . . in the City of Baltimore"); *McLane v. Hobbs,* 74 Md. 166, 171, 21 A. 708, 709 (1891) (to change domicile from one county to another, one "must remove from one county to another, with the *bona fide* intention of abandoning his former place" of domicile).

*Second,* one must intend that the new place of habitation be his or her domicile. *Comptroller v. Haskin, supra,* 298 Md. at 692, 472 A.2d at 76 (a person must "intend to establish a new domicile in the place of his new abode"); *Walsh, Administrator v. Crouse, supra,* 232 Md. at 388, 194 A.2d at 108 (facts must "show an intention to abandon a domicile and acquire a new one"); *Shenton v. Abbott, supra,* 178 Md. at 530, 15 A.2d

at 908 (change of habitation must be "coupled with an intention of remaining there permanently or at least for an unlimited time").

■ Consequently, even when a person does not intend to be domiciled any longer in that place which has been the person's domicile, such place continues to be his or her domicile until the person demonstrates the requisite intent of establishing a new domicile in a different area. *Comptroller v. Lenderking, supra,* 268 Md. at 620, 303 A.2d at 406.

## II.

We shall now turn to the facts of the case relevant to Senator Blount's domicile. In 1966 Senator Blount and Mrs. Blount were married. The couple moved into the second floor apartment of 3410 Copley Road, in Baltimore City, which is now within the 41st legislative district. The house at 3410 Copley Road was owned by Mrs. Blount's parents. The second floor apartment contains three rooms plus a kitchen and a bathroom. In 1970, while living at 3410 Copley Road, Senator Blount was elected to the Maryland Senate.[2] Senator Blount has continuously represented the same area in the Senate since the time he was first elected in 1970.

Senator and Mrs. Blount lived in the second floor apartment at 3410 Copley Road until February 1973 when they purchased a house at 3600 Hillsdale Road in Baltimore City. The house at 3600 Hillsdale Road was also located in what is now the 41st legislative district. Sometime in the 1970's Senator and Mrs. Blount acquired an interest in 3410 Copley Road as a result of the death of Mrs. Blount's parents.

In March 1985 the Blounts also acquired an interest in a house at 237 Mountain Laurel Lane in Annapolis. Senator and Mrs. Blount acquired this property from Mrs. Blount's aunt. Senator Blount testified that he never considered the

---

**2.** At the time of Senator Blount's election, 3410 Copley Road was located in the 5th district, but the 5th district, due to later redistricting, became the 41st legislative district.

Annapolis property to be a family home; instead it was a leisure home. Senator and Mrs. Blount would spend some weekends and occasional weekdays at the Annapolis house. During the 28 years that Senator Blount has been a member of the Maryland General Assembly, he has spent many of his nights in Annapolis while the General Assembly was in session, but he has usually stayed in a hotel and not at the house at 237 Mountain Laurel Lane.

The house in Annapolis was, according to Senator Blount, very rustic. In the late 1980's, the Blounts decided that they wanted to put a new house on the Annapolis property. On June 3, 1987, Senator and Mrs. Blount sold the house at 3410 Copley Road, Baltimore City, to a relative of Mrs. Blount in order to provide funds to have a new house built in Annapolis. On June 25, 1987, they sold the house at 3600 Hillsdale Road, also to raise money for the building of a new house on the Annapolis property. The Senator and Mrs. Blount retained a leasehold interest in the second floor apartment at 3410 Copley Road. As the apartment was much smaller than the house on Hillsdale Road, the Senator and his wife put much of their furniture in storage. Senator and Mrs. Blount have continuously rented the second floor apartment at 3410 Copley Road since the sale of the Copley Road and Hillsdale Road properties until the present. It is undisputed that Senator and Mrs. Blount lived at the 3410 Copley Road apartment after the sale of their Baltimore City property. The trial court found that "[c]anceled checks indicate that rent checks have regularly been sent to the landlord by Senator Blount for many years and also depict the Copley Road address."

In the early 1990's Senator Blount had bypass heart surgery. As a result, the Senator and Mrs. Blount became concerned about their ability to take care of their leisure property in Annapolis. The property consisted of a house on approximately 5 acres of land. Senator Blount and his wife decided that, in lieu of the Annapolis property, they needed a smaller place which the two of them would be able to take care of, and Mrs. Blount began looking for such a place. In 1995 Senator Blount and his wife put the Annapolis property on the

market. In March 1995 Senator Blount and his wife purchased a condominium at 9107 Ruth Elder Lane, in the Pikesville area of Baltimore County. The Senator testified that his wife looked at many different properties and finally settled on the condominium in Pikesville. This condominium is in the 11th legislative district.

According to Senator Blount, the Pikesville condominium was purchased as a retirement home. The furniture that was in the Annapolis house, and the furniture that had been placed in storage when the Senator and his wife moved back into the 3410 Copley Road apartment, was moved into the condominium. About this time Senator Blount's stepson also moved into the Copley Road apartment. The Annapolis property was finally sold in April 1997.

In early 1998, Senator Blount was undecided about whether he wanted to retire or run for re-election. In June 1998 he decided to run for re-election. As set forth in the trial court's findings, Senator Blount stated "that the Copley Road apartment is his domicile and ... that he has not abandoned it. He explains that the Ruth Elder Lane condominium was purchased with the intention of being his home and domicile after his retirement. Although 77 years of age, he has no present retirement plans."

When Senator Blount is not staying overnight in Annapolis and is not away on business or vacation, he spends, based on his testimony and the trial court's findings, "90 percent" of his nights at the Pikesville condominium and only occasional nights each month at the Copley Road apartment. According to the trial court's findings, one room at the Copley Road apartment is occupied by Senator Blount's stepson, and another room is used as Senator Blount's bedroom which "contains a futon sofa bed, a TV and other modest furnishings. The third room has been used as a den, and it contains a desk, TV and other furniture." The kitchen in the apartment "has a small table with two chairs, a stove and a refrigerator. There is no washer or dryer and no linens." On the other hand, the Pikesville condominium, in the words of the court below,

"consists of a fully equipped, modern townhouse condominium with garage. It contains a fireplace and is fully furnished with furniture which appears to be new."

The trial court found that most of Senator Blount's clothing is kept at the Pikesville condominium and that a "very few items of clothing [are kept] at the Copley Road apartment." The court pointed out that the telephone service at the Copley Road apartment was terminated in June 1998 by Senator Blount because, as the Senator testified, his stepson "incurred very high telephone bills on that account. . . . Senator Blount uses his mobile phone when he is there. On the other hand, telephone service is maintained at the Ruth Elder Lane condominium where there are at least two stationary telephones present."

The trial court also found that Senator Blount has had surgeries during the past three years, including a spinal fusion operation in 1997, and has recuperated at the Pikesville condominium. A family Christmas gathering in 1997 was at the Pikesville condominium.

The daily newspaper is delivered to the Pikesville condominium, and mail order or similar purchases are delivered there. On the other hand, as the trial court found, "[t]he majority of Senator Blount's mail is delivered to the Copley Road address. . . . Many magazines are delivered to the Copley Road address and some are left there until the Senator 'gets around to reading them.' The mail is picked up [from Copley Road] by the Senator or Mrs. Blount on a daily or near daily basis and then taken or delivered to the Senator's office or the [Pikesville] condominium." The court further found that "Mrs. Blount has planted some plants and flowers in front of the [Copley Road] premises and Senator Blount has watered them on occasion." Senator and Mrs. Blount pay for lawn care at 3410 Copley Road.

As to Mrs. Blount, the trial court found that "[s]he lives at Ruth Elder Lane [in Pikesville] and most of her clothing is kept there." Mrs. Blount keeps her jewelry at the condominium. There is homeowner's insurance on the premises and

contents of the Pikesville condominium, including enhanced coverage for jewelry, silver, furs and other valuables. Mrs. Blount spends most of her time at the Pikesville condominium. The trial court found that "Mrs. Blount has entertained at Ruth Elder Lane [Pikesville]. There is no evidence that the Blounts have entertained at Copley Road." A joint checking account, primarily used by Mrs. Blount, listed the Copley Road address until March 1998 when Mrs. Blount submitted to the bank a change of address form listing the Pikesville address.

Senator Blount has been a registered voter in the area that is now the 41st legislative district continuously since 1966, and he has regularly voted in that district. His initial 1966 voter registration listed his residence as 3410 Copley Road,[3] and his present voter registration lists his residence at 3410 Copley Road. At each time he registered to vote, Senator Blount stated under oath that his residency (i.e., domicile) was in the 41st district. See Code (1957, 1997 Repl.Vol.), Art. 33, § 3–6.

Senator Blount's state income tax returns, including the most recent, list his address as 3410 Copley Road, Baltimore City. Baltimore City has continuously been listed on the returns as the subdivision in which Senator Blount resides, and, therefore, the local portion of the income tax goes to Baltimore City. The income tax returns all reflect that they were filed under penalties of perjury.

In addition, the statutorily required annual statements of financial disclosure filed by Senator Blount listed his residence as 3410 Copley Road, Baltimore City. These statements were also filed under oath. See Code (1984, 1995 Repl.Vol., 1997 Supp.), § 15–602(2) of the State Government Article.

Senator Blount owns two motor vehicles, jointly with Mrs. Blount, and the motor vehicle registration reflects the Copley Road address. Senator Blount's driver's license also indicates that his address is 3410 Copley Road. The court below found

---

**3.** In this connection, see *Blount v. Board of Elections,* 247 Md. 342, 344, 230 A.2d 639, 641 (1967).

that, "[i]n addition, the Copley Road address is listed on numerous government documents...." The automobile insurance policies on the two motor vehicles, however, indicate that they are kept at the Pikesville address.

In addition to the checking account used primarily by Mrs. Blount, which now reflects the Pikesville address, the Blounts have joint bank accounts at Harbor Bank and NationsBank. The address listed on these accounts is 3410 Copley Road. With regard to the address listed on other types of accounts, the trial court found that Senator Blount "has made a conscious effort to list [the Copley Road address] on all his accounts and documents."

Senator Blount's legislative office is in Baltimore City and, as the circuit court found, "is actually located within District 42, one-half block from the boundary line of District 41. There are adequate explanations for this and the location has been approved by the General Assembly." While Senator Blount meets with some constituents in this office, "[h]e explained that he often prefers to meet in the more private and intimate setting at the Copley Road apartment." The circuit court further found that Senator Blount

"is very active socially and politically within the 41st Legislative District, but not in Baltimore County. At the Ruth Elder Lane address he knows very few people. When introduced to strangers, he always states that he is from Baltimore City. During the session of the General Assembly, he spends most of his nights in Annapolis. He often eats out and does not eat at home. He is frequently away from home very much because of his duties as an elected official and frequently does not arrive home until late at night."

The circuit court concluded its findings of basic facts by stating that Senator Blount "spends 99.9 percent of his waking hours within Baltimore City and the 41st Legislative District attending to his legislative responsibilities."

After setting forth the facts of the case as summarized above, the court below stated as follows:

"The evidence in this case clearly indicates that Senator Blount lives in Pikesville. The Court finds that he spends more than 90 percent of his nights there and his use of the Ruth Elder Lane property demands the conclusion that it is his residence."

The court continued by saying that, unlike the use of the Annapolis property which the Blounts previously owned,

"the use of the Ruth Elder Lane condominium has been significantly different. As indicated above, Senator Blount has, for all intents and purposes, chosen to sleep principally and on a full-time basis at the Ruth Elder Lane condominium."

The court, continuing to equate "use" of a dwelling with "sleep," indicated that Senator Blount's "use of the Copley Road Apartment has been minimal" because of the few nights spent there. With regard to Senator Blount's intent regarding the Copley Road apartment and the 41st district, the circuit court continued:

"He has continued to pay rent on the small apartment on Copley Road which he has used as a meeting place, a place to receive mail, and a place to occasionally sleep within the 41st Legislative District *in order to intentionally demonstrate his desire to retain his domicile within the District.* His efforts indicate an attempt to indicate domicile in the 41st Legislative District for political reasons." (Emphasis added).

The court concluded, however, that Senator Blount's "actions" show that he "has established his primary residence at the Ruth Elder Lane condominium" and show that "Senator Blount abandoned his prior domicile at Copley Road in favor of a new domicile on Ruth Elder Lane."

### III.

Although this case may be somewhat close, in our view the circuit court erred in deciding that Senator Blount had abandoned his prior domicile in Baltimore City and established a new domicile in the Pikesville area of Baltimore

County. The court's decision cannot be squared with this Court's prior opinions concerning domicile. Moreover, the court below overlooked several well-settled principles governing determinations of domicile.

The circuit court seemed to conclude that Senator Blount intended to retain his domicile in the 41st legislative district but that, because he has "chosen to sleep principally" at the Pikesville condominium, his domicile is not in the 41st legislative district in Baltimore City but is in the Pikesville area of Baltimore County. This reasoning is inconsistent with the principle, set forth in virtually all of this Court's prior opinions regarding domicile, that the "controlling factor in determining a person's domicile is his intent." *Bainum v. Kalen, supra,* 272 Md. at 497, 325 A.2d at 396. While various objective factors or contacts are looked to in determining that intent, along with the person's testimony as to intent, the ultimate question is still one of intent. The objective factors or contacts do not themselves directly decide one's domicile; instead, they are indicative of a bona fide intent. The ultimate question in this case is not whether the condominium in Pikesville or the apartment in Baltimore City has recently been Senator Blount's primary sleeping place. Instead, the ultimate question is whether Senator Blount has a bona fide intent to remain domiciled in the 41st district.

The court below also seemed to overlook the principle that no single factor or contact evidencing domiciliary intent is conclusive, and "no one" factor "will render a person incapable" of establishing a domicile in a particular place. *Toll v. Moreno, supra,* 284 Md. at 443–444, 397 A.2d at 1018. The circuit court in the present case appeared to view one's primary place of abode during the relevant period as the single determinative factor. The court also seemed to equate one's primary place of abode with where he or she principally sleeps.

As previously pointed out, however, many cases in this Court have held that persons were domiciled in particular areas even though they did not actually live in those areas

during the critical time periods. For example, recently in *Wamsley v. Wamsley, supra*, 333 Md. at 463–464, 635 A.2d at 1326–1327, the evidence and the trial judge's findings showed that Richard Wamsley, a member of the armed services, intended to be domiciled in Maryland even though he had not actually lived in Maryland for several years. He paid Maryland state income taxes, maintained his driver's license and voter registration in Maryland, and listed Maryland as his home on his employment records. The trial judge, in holding that Wamsley was not domiciled in Maryland, stated that these various factors indicating intent were "insufficient to 'overcome[ ] the basic presumption that your domicile is where you live,' " 333 Md. at 463, 635 A.2d at 1326. This Court held that the trial judge expressed "a view of the law that is not correct." *Ibid.*

Furthermore, the court below seemed to give little or no effect to the principles applicable when the issue is whether a person has abandoned a clearly established domicile and acquired a new one. Senator Blount certainly was, for a very long time, domiciled in Baltimore City, in the area of the 41st legislative district. The trial court, therefore, should have recognized that there is a presumption that the Senator's Baltimore City domicile continued, and that there would be no change of domicile unless Senator Blount intended to abandon his 41st district domicile and intended to establish a new domicile in Baltimore County.

In addition, the circuit court, while finding that Senator Blount took actions "to intentionally demonstrate his desire to retain his domicile in the [41st] District," apparently discounted this finding because, in the court's view, the Senator's intent and actions were "for political reasons." In this regard, the circuit court committed the same error which this Court found in *Roberts v. Lakin, supra*, 340 Md. at 155, 665 A.2d at 1027. In the *Roberts* case, the trial court had discounted Roberts's voter registration in a particular legislative district on the ground that it was "self-serving." In holding that the court erred, we stated (340 Md. at 155 n. 5, 665 A.2d at 1028 n. 5):

"As earlier indicated, '[o]ne's domicile, generally, is that place where he intends it to be.' *Dorf v. Skolnik,* 280 Md. 101, 116, 371 A.2d 1094, 1102 (1977); *Bainum v. Kalen,* 272 Md. 490, 497, 325 A.2d 392, 396 (1974). Under circumstances where one intends his domicile to be in a particular area, and takes the appropriate steps to evidence a domicile in that area, his motive for doing so is ordinarily not pertinent. One may intend to be domiciled in a particular area because of perceived tax advantages, because of the climate, because he wants to run for public office from that area, or for countless other 'self-serving' reasons. The fact that the motivation is 'self-serving' in no way undercuts the intent shown by various objective factors. Establishing or maintaining a domicile in a specific area in order to run for public office from that area frequently occurs; it is entirely legitimate."

It is undisputed that, until the Pikesville retirement condominium was acquired in 1995, Senator Blount had been domiciled in Baltimore City continuously for over fifty years. He has been a registered voter in Baltimore City since 1952.[4] He moved into the dwelling at 3410 Copley Road in 1966. Immediately before the Pikesville condominium was acquired in 1995, Senator and Mrs. Blount's primary place of abode was the second floor apartment at 3410 Copley Road. After the Pikesville condominium was acquired, and until the present, Senator Blount has continued to maintain the second floor apartment at 3410 Copley Road as a place of abode. He sleeps there occasionally, meets persons there during the day on legislative business, receives his mail there, lists 3410 Copley Road as his address for all official purposes and on most accounts. While, as the trial court found, the apartment at 3410 Copley Road has not been Senator Blount's primary place of abode since the acquisition of the Pikesville condominium, it is not simply a "mail drop" as asserted by the plaintiff in this case. (Appellee's brief in this Court at 28).

---

**4.** *See Blount v. Board of Elections, supra,* 247 Md. at 344, 230 A.2d at 639.

The only significant change in the circumstances indicating Senator Blount's domiciliary intent since 1995 has been the change in the Senator's primary place of abode. Moreover, in light of the Senator's legislative business and his busy schedule, his change in primary place of abode has largely been limited to where he primarily sleeps and where he recuperates from illness.

Senator Blount unequivocally testified that he intends for Baltimore City to remain his domicile until he retires. He maintains a place of abode there. As found by the trial court, when he is not in Annapolis or outside of the State, he spends "99.9 percent of his waking hours within Baltimore City and the 41st Legislative District" and not in Baltimore County.

In *Gallagher v. Bd. of Elections, supra,* 219 Md. 192, 148 A.2d 390, the Court held that former Governor McKeldin had not abandoned his domicile in Baltimore City despite the fact that, for most of the relevant time period, he had no dwelling place in Baltimore City and did not vote there. In addition, he gave his residence as Annapolis on his state income tax returns; he opened a bank account in Annapolis; he changed his motor vehicle registration and driver's license to reflect an Annapolis residency, and he applied for and was granted non-resident membership in a Baltimore area club. 219 Md. at 197, 148 A.2d at 393. Nevertheless, among the factors deemed to be important in determining that he had not abandoned his Baltimore domicile and acquired an Annapolis domicile, was Governor McKeldin's testimony that he did not intend to abandon his domicile in Baltimore City and that, during the relevant period, " he had spent 80% of his 'waking time' in the City [of Baltimore]." 219 Md. at 198, 148 A.2d at 393.

The *Gallagher* case, and a multitude of other cases, demonstrate that one's principal place of abode during the pertinent time period is not conclusive of one's domicile. As *Gallagher* held, a person's testimony concerning his or her intent, and where the person spends most of his or her time, are very important.

Apart from the change in primary place of abode, every other significant circumstance evidencing Senator Blount's intent confirms that he did not intend to abandon his Baltimore City domicile and establish a new domicile in Baltimore County. Voter registration, voting, state income tax returns, financial disclosure statements, driver's license, motor vehicle registration, the address at which mail is received, listings on various accounts, etc., all objectively disclose Senator Blount's real intent not to abandon his Baltimore City domicile prior to retirement. *See Rasin v. Leaverton, supra,* 181 Md. at 94, 28 A.2d at 613 ("his registering and voting in Baltimore City ... is ... strongly persuasive and confirmatory [of domicile in Baltimore City], especially as the registrant must have taken an oath that he was in fact a resident. The oath is not a meaningless form").

If the residency requirement for representing a particular legislative district in the General Assembly were that one must have his or her primary place of abode in that district, we would have affirmed the judgment of the court below. Under such a requirement, many prior cases in this Court would have been decided differently. The requirement, however, is that one must be domiciled in the district, and domicile is not synonymous with primary place of abode.

On the other hand, we do not minimize the importance of one's primary place of abode as an objective factor indicating one's domiciliary intent. It is one of the two most important factors, the other being place of voting or voter registration. There is a rebuttable presumption that a person's place of abode is his domicile. *See Harrison v. Harrison, supra,* 117 Md. at 615, 84 A. at 59 ("The presumption of the law is that where a person actually lives is his domicil, though this is a rebuttable presumption").

Nevertheless, where a person claims to be domiciled in an area, but the person's principle place of abode is not in that area during the relevant time period, and there are explanations for this which are not inconsistent with an intent to be domiciled in that area, the factor of one's primary

dwelling place is of diminished importance in determining domicile. *Roberts v. Lakin, supra,* 340 Md. at 156, 665 A.2d at 1028 ("The brief period . . . during which Roberts spent most of his nights . . . [outside his previously established domicile] does not, under the circumstances, show an abandonment of domicile. . . . It was due to relationship problems with his girlfriend rather than a desire to" change domicile); *Wamsley v. Wamsley, supra,* 333 Md. at 461, 635 A.2d at 1325 ("The fact that members of the military are frequently moved about under military orders will more than explain why an individual occupies a place of abode beyond" the area claimed to be his or her domicile); *Bainum,* 272 Md. at 499, 325 A.2d at 397; *Gallagher v. Bd. of Elections, supra,* 219 Md. at 205, 148 A.2d at 397.

■ In this case there are circumstances which, to some extent, explain why Senator Blount spends most nights and time recuperating from surgeries, as well as attends family gatherings, at the Pikesville condominium. These circumstances are not inconsistent with his intent that he remain domiciled in Baltimore City until he retires. Although Mrs. Blount's domicile is not directly an issue in this case, and we make no decision about her domicile, it is certainly possible that she has abandoned her prior domicile in Baltimore City and has established a new domicile in the Pikesville area of Baltimore County.[5] At any rate, her only place of abode is

---

5. Prior to 1972, the law of Maryland was that a married woman ordinarily had the domicile of her husband, and that her domiciliary intent was not pertinent. *See, e.g., Miller v. Miller,* 247 Md. 358, 365, 231 A.2d 27, 31 (1967) ("the general rule is that in the absence of a decree of separation or divorce the domicile of a wife is the same as that of the husband"); *Hawks v. Gottschall,* 241 Md. 147, 152, 215 A.2d 745, 748 (1966) (wife's intent regarding her domicile "has no bearing on her own domicile, or her husband's domicile of choice . . . because her domicile followed that of her husband"); *Rumbel v. Schueler,* 236 Md. 25, 27, 202 A.2d 368, 369 (1964) ("the legal domicile of a wife is that of her husband and he has the right to choose that domicile"); *Bennett v. Bennett,* 197 Md. 408, 412, 79 A.2d 513, 515 (1951) ("The doctrine is well established that the husband, being the head of the family and legally responsible for its support, has the right to choose and establish the domicile for himself and his wife"); *Whiting v.*

now the Pikesville condominium.[6] It is certainly not unreasonable for Senator Blount to wish to spend a majority of his nights at the Pikesville condominium so that he can be with his wife, or to recuperate from surgeries at the Pikesville condominium so that his wife's assistance is readily available. His conduct in this regard is explained by his wife's decision to make the Pikesville condominium her sole place of abode. In light of this, Senator Blount's conduct is not inconsistent with his intent to remain a domiciliary of Baltimore City until he retires.

The case principally relied upon by the plaintiff Boston is *Dorf v. Skolnik, supra,* 280 Md. 101, 371 A.2d 1094, where this Court held that a member of a party central committee had abandoned her prior domicile in Baltimore City and had acquired a new domicile in Baltimore County even though she had retained her voter registration in Baltimore City. The facts of the instant case, however, are unlike the facts in the *Dorf* case. In *Dorf,* the only explanation for Ms. Dorf's change of abode from Baltimore City to Baltimore County was an intent to change her domicile. She stated on her state

---

*Shipley,* 127 Md. 113, 117, 96 A. 285, 286 (1915) ("The general rule is that in the absence of a decree of separation or divorce the legal domicile of a wife follows that of her husband").

In 1972, Article 46 of the Maryland Declaration of Rights, sometimes referred to as the Equal Rights Amendment or E.R.A., was ratified and became part of the Maryland Constitution. It provides that "[e]quality of rights under the law shall not be abridged or denied because of sex." It is obvious that the general rule concerning a married woman's domicile, set forth in the above cited cases, was overruled by Article 46. *See, e.g., Giffin v. Crane,* 351 Md. 133, 148, 716 A.2d. 1029, 1037 (1998) ("the Amendment [Article 46] can only mean that sex is not, and can not be, a factor in the enjoyment or the determination of legal rights"); *State v. Burning Tree Club, Inc.,* 315 Md. 254, 269, 554 A.2d 366, 374, *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989) ("sex-based classifications [are] generally forbidden by the E.R.A."). Consequently, one spouse's domicile is not determinative of the other spouse's domicile, and each spouse may establish his or her domicile as he or she chooses.

**6.** In fact, numerous factors relied on in the plaintiff-appellee's brief in this Court to indicate domicile in Baltimore County relate solely or primarily to Mrs. Blount.

income tax return that she was domiciled in Baltimore County, and her Baltimore County address was listed as her residence on her insurance policy, driver's license, charge accounts and credit card accounts.

To reiterate, except for his principal place of sleeping, the significant circumstances in the present case confirm Senator Blount's statements that he did not intend to abandon his long established domicile in Baltimore City. This is not a case where someone desires to run for office in an area where he or she has not lived, and does not wish to live, but merely establishes a "mail drop" in that area and lists the "mail drop" as his or her address for various official and unofficial purposes. Such person has no bona fide intent to be domiciled where the "mail drop" is established. By contrast, Senator Blount has a long and solid connection with Baltimore City, with the 41st legislative district, and with 3410 Copley Road. The plaintiff in this case failed to prove that Senator Blount intended to abandon his domicile in Baltimore City and establish a new domicile in Baltimore County.