892 A.2d 604

**Karyn S. BERGMANN, et al.**

**v.**

**BOARD OF REGENTS OF the UNIVERSITY SYSTEM OF MARYLAND, et al.**

**No. 0975, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Feb. 23, 2006.

240

Anthony M. Conti (Paul A. Fenn, on the brief), Baltimore, for appellant.

Dawna M. Cobb (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: ADKINS, KRAUSER, JAMES S. GETTY (Retired, Specially Assigned) JJ.

ADKINS, Judge.

For the second time, University of Maryland students challenge the constitutionality of the school's methods of deciding a student's domicile for purposes of qualifying for lower, instate tuition. This appeal is brought by four students [1] enrolled in professional and postgraduate degree programs at the University of Maryland, Baltimore, who sued the appellees, the Board of Regents of the University System of Maryland, the University, and the State, [2] seeking class certification and claiming that the Board violated their constitutional rights when it refused to reclassify them as in-state residents. This classification decision denied them the substantial tuition reduction offered to Maryland residents.

---

[1]. We shall collectively refer to these four students as "the Students." We shall also sometimes refer to each student individually. The four Students and their areas of study are: Karyn Bergmann, law student; Lance Pietropola, dental student; Cori Esser, physical therapy student; and Donald C. Wright, law student.

[2]. We shall referred to these entities in the singular as "the Board" or "UM").

## The Tuition Reclassification Process

When a student initially applies to UM while residing out-of-state, the student is classified as an out-of-state student for tuition differential purposes. All of the Students resided in another state at the time of their application. Under the UM policy, a student can petition UM for reclassification if the student believes that he meets the in-state residency criteria. The petition and supporting documentation are filed with the Office of Records and Registration, and they are reviewed by the Campus Classification Officer (the "CCO"), who is also the Director of Records and Registration.

Wayne A. Smith, who held this position for 35 years, reviewed these documents, then sent a letter to each applicant-student, advising each of his decision. When Smith retired on July 1, 2002, Thomas C. Day, Jr., who had been Associate Director of Records and Registration for five years, assumed Smith's position as Director of Records and Registration.

Under UM's tuition reclassification policy (the "Policy"), a student dissatisfied with the decision of the CCO may first meet with the CCO to discuss the decision, and then appeal to the Campus Review Committee ("CRC"), which renders a final decision on the issue. A student who wishes to challenge the CRC decision must sue UM. *See* Md.Code (1978, 2004 Repl.Vol., 2005 Cum.Supp.), § 12–104(b)(3) of the Education Article ("Educ.")(authorizing UM to sue or be sued).

## Procedural History In Circuit Court

After exhausting these administrative remedies, the Students filed suit against UM, seeking certification for a class action.[3] The circuit court denied the Students' motion for class certification. Both the Board and the Students filed motions for summary judgment. After a hearing on these

---

**3.** Bergmann initially filed this suit on October 15, 2002. The other students were added as plaintiffs by an amended complaint.

motions, the circuit court granted UM's motion and denied the Students' motion.

The Students filed a timely appeal to this Court, raising four issues:

I. Did the circuit court err in applying the substantial evidence standard of review to the Board's residency classification decisions?

II. Were the Students entitled to a jury trial on their challenge to the denial of in-state reclassification?

III. Did the Board's tuition charge differential policy violate the Maryland Declaration of Rights and the holding in *Frankel v. Bd. of Regents,* 361 Md. 298 [761 A.2d 324] (2000)?

IV. Did the circuit court err in denying the Students' request for class certification?

We shall answer no to questions I and II, and yes to question III. Because we answer yes to question III, we reverse the decision of the circuit court, and remand the case to that court. We do not answer question IV, but rather instruct the circuit court to reconsider whether, in light of this opinion and Md. Rule 2–321, a class should be certified.

## The *Frankel* Decision And UM's Revised Tuition Policy

The Court of Appeals' decision in *Frankel v. Bd. of Regents,* 361 Md. 298, 761 A.2d 324 (2000), is crucial to this case, both as governing precedent, which we discuss later, and as background information. In *Frankel,* the Court of Appeals held that UM, a state "instrumentality," violated the equal protection component of Article 24 of the Maryland Declaration of Rights when it adopted and applied a policy that "absolute[ly] preclu[ded] ... in-state tuition status for any student whose primary monetary support comes from an out-of-state source[.]" *Id.* at 312, 761 A.2d 324.[4] The decision in *Frankel,* which was issued on November 6, 2000, caused the Board to

---

4. We shall discuss the rationale and implications of *Frankel* in the Discussion section of this opinion.

modify its policy less than a month later, in an effort to comply with *Frankel's* dictates. Under the Board's former policy, no matter what a student could show with respect to traditional domicile factors, the student could not achieve in-state tuition status if more than one-half of his or her financial support came from individuals residing out of state. *See id.* at 314, 761 A.2d 324.

The revised Tuition Classification Policy, adopted on November 27, 2000, provides in pertinent part:

I. POLICY

It is the policy of the Board of Regents of the University System of Maryland (USM) to recognize the categories of In–State and Out–of–State students for the purpose of admission, tuition, and charge differentials at those institutions where such differentiation has been established.

 A. An In–State student is a student whom the University determines to be a permanent resident of the State of Maryland. For the purposes of this Policy, **"permanent resident" is defined as a person who satisfies all the following conditions and has done so for at least twelve (12) consecutive months immediately prior to and including the last date available to register for courses in the semester/term for which the person seeks In–State Status:**

 1. **Is not residing in the State of Maryland primarily to attend an educational institution; and,**

 2. Owns and continuously occupies or rents and continuously occupies living quarters in Maryland . . .; and,

 3. Maintains within Maryland substantially all personal property; and,

 4. Pays Maryland income tax on all earned taxable income including all taxable income earned outside the State; and,

 5. Registers all owned motor vehicles in Maryland in accordance with Maryland law; and,

6. Possesses a valid Maryland driver's license, if licensed, in accordance with Maryland law; and,

7. Is registered in Maryland, if registered to vote; and,

8. Receives no public assistance from a state other than the State of Maryland or from a city, county or municipal agency other than one in Maryland; and,

9. Has a legal ability under Federal and Maryland law to live permanently without interruption in Maryland....

D. Assignment of In–State or Out–of–State classification will be made by the University upon an assessment of the totality of facts known or presented to it. The person seeking In–State Status shall have the burden of proving that he or she satisfied all requirements.

E. **Either of the following circumstances raise[s] a presumption that the student is residing in the State of Maryland primarily for the purpose of attending an educational institution.**

**1. The student was attending high school or residing outside Maryland at the time of application for admission to a USM institution, or,**

**2. The student is both (a) not financially independent and (b) is financially dependent upon a person not a resident of Maryland.**

**The burden shall be on the student to rebut the presumption.**

II. PROCEDURES....

B. A change in status must be requested by submitting a USM "Petition for Change in Classification for Admission, Tuition and Charge Differential". A student applying for a change to In–State Status must furnish all required documentation with the Petition by the last published date to register for the forthcoming semester/term for which the change in classification is sought....

E. **Each institution of the University System of Maryland shall develop and publish additional procedures to implement this policy.** Procedures shall provide that on request the President or designee has the authority to waive any residency criterion set forth in Section I. if it is determined that the student is indeed a permanent resident and the application of the criteria creates an unjust result. These procedures shall be filed with the Office of the Chancellor.

III. DEFINITIONS

A. Financially Dependent: For the purposes of this policy, a financially dependent student is one who is claimed as a dependent for tax purposes or who receives more than one-half of his or her support from another person during the twelve (12) month period immediately prior to the last published date for registration for the semester or session. If a student receives more than one-half of his or her support in the aggregate from more than one person, the student shall be considered financially dependent on the person providing the greater amount of support.

B. Financially Independent: A financially independent student is one who (1) declares himself or herself to be financially independent as defined herein; (2) does not appear as a dependent on the Federal or State income tax return of any other person; **(3) receives less than one-half of his or her support from any other person or persons; and (4) demonstrates that he or she provides through self-generated support one-half of his or her total expenses....**

G. Self–Generated:.... For the purposes of this policy, **grants, stipends, awards, benefits, loans and gifts (including federal and State aid, grants, and loans) may not be used as self-generated income.** (Emphasis added.)

We shall refer to the rebuttable presumption set forth in section I(E)(2) of the above Tuition Policy as the "Financial Dependence Presumption." We shall call the rebuttable presumption set forth in section I(E)(1) the "Residence at Application Presumption." Because these rebuttable presumptions were frequently used by UM as the basis for determining that a student "is residing in the State of Maryland primarily for the purpose of attending an educational institution," they are a central focus of this case. Recollection of these terms will facilitate understanding of the remainder of this opinion.

## Facts And Administrative Proceedings

The Students all fell within the Residence at Application Presumption and the Financial Dependence Presumption. They all lived outside Maryland at the time they applied to UM, and none were able to successfully demonstrate that they earned or received 50% or more of their total expenses (including tuition expense) for twelve months preceding their petition for re-classification. We shall set forth other pertinent facts about each of the Students below. Except as noted, all met Policy criteria I(A)(2) through I(A)(9).

## Karyn Bergmann

Karyn Bergmann was accepted at the UM Law School for the term beginning in Fall 2000. She was age thirty-six when she applied, and had worked for a number of years since graduating from college. She leased her Maryland residence, and obtained a Maryland driver's license and vehicle registration in August 2000. She supported herself through the school year by using her summer salary and her student loans, which involved no co-signer. Her law-related activities included lobbying the General Assembly for passage of the Anti–Discrimination Act of 2001 and memberships in the Maryland organization Freestate Justice, the Maryland Public Interest Law Project, and the Maryland Environmental Law Society.[5]

---

5. Bergmann was summonsed to jury duty in Baltimore City in the summer of 2001. She was also summonsed to jury duty in the federal

She worked for the Maryland Office of the Attorney General in the Department of the Environment in 2001, and filed a Maryland income tax return reporting her income from that job. She spent many weekends in Virginia during her first year at UM, but not thereafter. Bergmann stated in her petition to the CRC that she was more comfortable with Maryland's political environment than that of Virginia, where she resided at application. She filed her petition for reclassification from out-of-state to in-state tuition status on August 16, 2001. At that time, she had not been claimed as a tax dependent for thirteen years.

On September 18, 2001, Smith sent Bergmann a letter advising that she failed to demonstrate that she was "not residing in [Maryland] primarily to attend an educational institution," and that she fell within both the Residence at Application Presumption and the Financial Dependence Presumption because, upon application to UM, she resided outside Maryland, and she failed to show that she generated one-half or more of her annual expenses. When Bergmann met with Smith on September 27, 2001, regarding her petition, he told her she "really just needed to show that she earned, with a job, more than $15,000[,]" which would equal half of her reported expenses of $30,130, $19,718 of which was her law school tuition. She filed her formal appeal to the CRC on October 12, 2001, providing tax returns for twelve years, and an affidavit stating her intent to sit for the Maryland bar.

On October 18, 2001, the CRC issued a formal denial of her petition on the ground that she

> failed to convince the committee that, during the period covered by your application, you were not residing in ... Maryland primarily to attend an educational institution. Specifically, you were residing outside Maryland at the time of application for admission.

District Court for Maryland in the summer of 2002, and she took the Maryland bar in the summer of 2003. These events had not occurred when Smith initially denied her petition.

The denial was issued after the Court of Appeals' 2000 decision in *Frankel.*

This lawsuit was filed on October 15, 2002. Eleven months later, an Assistant Attorney General representing UM wrote to Bergmann's attorney, acknowledging UM's error in considering her petition:

> The Court of Appeals [in *Frankel* ] ruled that while one of the policy's criteria used to determine residency was legally impermissible, "[a] refund under the [Board of Regents] Policy cannot be made until the appropriate officials properly rule upon [Bergmann's] request for in-state status, employing legally permissible criteria." Using this holding as a guide, and **because ... the Board's post-Frankel policy**—which the University contends is constitutional—**was misapplied to Ms. Bergmann's 2001 petition,** the University must first review Ms. Bergmann's petition using a correct interpretation of the Board of Regents policy governing residency classification for tuition purposes before it can consider her claim for a refund. **If after this review the University determines that she should have been reclassified as an in-state student, it will refund** Ms. Bergmann the difference between in-state and out-of-state tuition for two years at the rates that were charged **in academic years 2002 and 2003.** (Emphasis added.)

According to UM, Bergmann declined to participate in that review, but the CRC nonetheless reconsidered her petition on October 21, 2003, as well as "information relevant to her residency status as it existed at the time she filed her petition in 2001, which had been developed during discovery" in this suit. Information forthcoming since her 2001 application included her summons for and service on a Baltimore City jury in 2001, as well as her summons for jury duty in the federal District Court for Maryland in the summer of 2002. She also studied for and took the Maryland bar in the summer of 2003. Nonetheless, the CRC decided to deny Bergmann's petition again.

In the "Memorandum of CRC Action" recording such action, the CRC stated that Bergmann "did not satisfy part I.A.1 and probably did not satisfy part I.A.3 of the Policy." The pertinent text of this Memorandum states:

**I.A. 1.** Under Part I.E of the Policy, Ms. Bergmann was subject to a presumption that she was in Maryland primarily for the purpose of attending an educational institution. This is due, first, to the fact that she lived in Virginia when she applied to Law School, and second, to the facts that she was not "financially independent" as the term is defined in the Policy and not financially dependent upon a Maryland resident, during her first year in Law School. She had the burden of rebutting that presumption in order to show that she was not in Maryland primarily to attend Law School. The CRC unanimously agreed that Ms. Bergmann did not rebut the presumption that she was in Maryland primarily for the purpose of attending an educational institution. The CRC decided that the documents did not provide sufficient evidence that she was in the State of Maryland during her first year of law school primarily for a purpose other than attending the school. Ms. Bergmann did not establish or document any ties to Maryland before or during her first year of law school which would allow the CRC to find that she was living in Maryland primarily for any purpose other than to attend law school.

In addition, Ms. Bergmann, by her own admission, spent a lot of social time in Virginia. Her bank statements document that many of her purchases were made in Virginia during the first year of law school.

Based on the information in her statements, the CRC interpreted that her involvement in student groups appeared to be an extension of her law school activities rather than as a resident of Maryland. The file showed no record of community involvement in Maryland beyond her Law School activities.

In looking for a source within the documents which would have allowed the committee to interpret her activities during the first year of school differently, the CRC did not find

any documentation or affidavit from a friend or colleague of Ms. Bergmann's which provided any credible support that she had relocated to Maryland for any purpose other than to attend law school. The CRC was not persuaded otherwise by Ms. Bergmann's self-serving assertion to her intent to be a Maryland resident.

**I.A.3.** This is a requirement that the petitioner maintain within Maryland substantially all personal property. Ms. Bergmann had lived on her own for several years before applying to Law School, presumably acquiring furniture and other possessions for operation of a household. Ms. Bergmann lived in a furnished dormitory room at the Baltimore Student Union during her first year in law school. It is doubtful that she moved substantially all of her personal property into her dormitory room located on campus, even though she so indicated in her deposition.

Failure to meet the requirements of either I.A.1 or I.A.3 disqualifies a student from reclassification to in-state status for tuition purposes.

Upon examining the totality of the circumstances concerning Ms. Bergmann's case, including her deposition, all the documentation provided to the CRC, and the criteria for granting in-state tuition status, the CRC felt that its decision regarding Ms. Bergmann's residency during her first year in law school was definitive.

The Memorandum said nothing about her residency during her second year, although the Board's earlier letter to Bergmann's counsel indicated the review would resolve both the second year and third year tuition status.

### Lance Pietropola

Baltimore was the closest major metropolitan area to Lance Pietropola's Pennsylvania home when he enrolled in UM School of Dentistry in the summer of 2000. During his first year of dental school, he lived in Baltimore, where he rented an apartment. During the summer after his first year, he taught school through an Americorp program affiliated with UM.

Pietropola filed a petition to be reclassified for his second year of dental school, in August 2001. He tried to establish his financial independence by listing his $25,000 loan from UM as income, under the general category of "Sources of Funds and Other Support."[6] He also listed as income a $20,855 "federal" loan and a $1,500 "HUD grant," which, together with $3,690 of "self-generated income," totaled $51,095 in income. He listed $50,547 in expenses, including $24,311.60 for "tuition and fees." On September 18, 2001, he received the same letter from Smith denying his petition, citing the same Financial Dependency Presumption applied to Bergmann. When Pietropola met with Smith, as part of his appeal from Smith's decision, Smith said "pretty abruptly" that his $25,000 loan was no longer being considered as personal income, and that there was not much more to discuss.

Pietropola filed a second petition on December 16, 2002. His statement of income and expenses was similar, except that he listed his $25,000 loan from UM differently. This time, he classified it as "Self-Generated Income." On January 13, 2003, Day, who had succeeded Smith as Campus Classification Officer, sent a letter denying Pietropola's second petition for the same lack of financial independence reasons as his first letter. When Pietropola later encountered Day in the Records and Registration Office, Day told him that, without some new information, there was "not a whole lot to discuss."

In July 2002, Pietropola became engaged to a Maryland resident who worked in Baltimore; they married in May 2003. On August 25, 2003, Pietropola filed a third petition, requesting re-classification for his third year of dental school. Day initially rejected this petition in September 2003, on the same Financial Dependence Presumption grounds. On October 21, 2003, at an appeal meeting with Pietropola, Day agreed to reconsider based on Pietropola's marriage and his wife's employment. On December 9, 2003, Day sent a letter to Pietropola informing him that his petition for reclassification was

---

6. He designated it under the subcategory for loans as a "personal" loan.

granted, retroactive to the beginning of his third year in Fall 2003. Although Day stated no reasons in his December 9 letter, at his deposition Day said that Pietropola's wife's employment was dispositive. Pietropola's entitlement to reclassification for his second year remains unresolved. His activities while living in Maryland included church attendance, volunteer work, and a mentoring program.

## Cori Esser

Cori Esser lived in the District of Columbia with her husband when she applied to and then entered UM School of Physical Therapy in 1998. Her sister-in-law lived in Maryland, but she and her husband rented an apartment in D.C. because the cost was lower than properties she looked at in Maryland. She filed a petition for reclassification to in-state tuition status on May 12, 2000, at the end of her second year. On June 21, 2000, Smith denied her request on grounds of the Financial Dependence Presumption.[7]

During her second year in physical therapy school, Esser rented an apartment in Bethesda, Maryland with another physical therapy student who also attended UM. But Esser only paid $200 of the $850 per month rent for the apartment, and she did not spend every night there, often returning to be with her husband in DC. She did not move her furniture into the Bethesda apartment.

## Donald C. Wright

Donald C. Wright began to live in Maryland in April 1999, when he started work at the Cheesecake Factory in Baltimore. Before that date, he had regularly visited his girl-

---

7. The Board points out that Esser did not appeal from the denial of her 2000 petition, but in 2001 she requested that the denial be reconsidered. The Board explains that this request was denied as untimely because appeals must be filed within fifteen days of the University's initial decision. It makes the same point about Wright. Yet the Board does not ask that their cases be dismissed for failure to exhaust their administrative remedies. On remand, the circuit court should address what if any ramifications flow from the failure of any of these Students to exhaust this administrative remedy.

friend, who lived in Maryland, on weekends. He entered UM School of Law in the fall of 1999.

Wright filed his first petition for reclassification to in-state status on August 16, 2000, shortly before he started his second year of law school. On September 13, 2000, before the *Frankel* decision was issued, Wright received a denial letter from Smith, citing the Financial Dependence Presumption. This letter contained more specifics than letters sent to the other Students. It indicated that Wright did not answer all the questions, that his expenses appeared to be low, and that his six months of earnings "were not documented."

Wright filed a second petition on September 10, 2001, seeking reclassification for his third year of law school. Smith denied this petition by letter dated October 15, 2001. In addition to citing the Financial Dependence Presumption, Smith pointed to Wright's failure to provide a lease showing his living quarters since April 30, 2001.

### Other Facts Regarding UM's Application Of Tuition Policy Testimony Of Smith

Smith served as the Campus Classification Officer and Director of Records and Registration during all pertinent periods until he retired on June 30, 2002. When Smith was asked how the *Frankel* decision "impact[ed] in any way your job duties and ... your handling of the petition process," he answered:

A. The University as a whole changed some of the questions that were asked and provided all of the campuses, including my campus, including me, with what the new Board of Regents policy was.

Q. Did anyone describe to you what the changes were?

A. No, I read through them. Nobody really described them for me.

In a follow-up question by the Students' counsel, asking "[w]hat was the change in policy after *Frankel*," Smith responded:

One of the changes that w[as] most prevalent for me is it was emphasized that all of the conditions of in-state status needed to be met for 12 consecutive months. The other area was that the dependency, the financial dependency, of an applicant or a student was no longer restricted to parent, spouse or legal guardian.

This meant that financial dependency could also occur when other relatives or third parties (excluding employers) provided more than 50% of the Students' support.

When asked, "[w]hat are the primary criteria that you would use to determine a student's change of residency," Smith stated:

All the information that is in 1a and 1 through 9 [of the Tuition Policy] [is] looked at in addition to whether or not by definition, as you go through Policy A the A, B, C, D, and E, all of those are look[ed] at. You look at the policy in its entirety.

He explained that the petitioning students **must** meet all of Conditions 1 through 9 to merit in-state tuition.

When asked whether students who met Conditions 2 through 9 would therefore necessarily qualify under Condition 1, Smith replied, "I think so." [8] Later, to the contrary, he said that, when the petitioning student cannot demonstrate that she is "making enough money to be self-sufficient," there is no circumstance that would allow the student to meet the residency requirement.

As set forth previously, the Residence at Application Presumption (section E(1) of the Tuition Policy) requires an inference against the student based on his residency at the time of application to UM. Smith testified that this presumption disappears after twelve months living in Maryland while in school:

---

8. He also said that when you are determining if Condition 1 (i.e., the student is not residing in the State . . . primarily to attend an educational institution") is met, "2 through 9 are considered."

If they've overcome [the presumption] by living in the State of Maryland for 12 consecutive months, then in my opinion they've overcome that and then I'm not concerned about our living outside the state. Nor am I concerned about you went to high school outside the State[.]

With respect to Bergmann's petition, he explained:

The reason that she was denied was the fact that, in looking at the entirety of her case, although she had physical presence, and when you look at the petition and what she had done, she had come into the state a week or two before the beginning of the semester having moved from another state, Virginia in this case, lived in student housing for a year, was a full-time student ... and at the end of her first year went and got a temporary job for a couple months, and that's what I got to look at.

Smith also said that, if a student is financially dependent on a parent who lives out-of-state, there is no way to rebut the Financial Dependence Presumption (*i.e.*, that they are in Maryland primarily to attend school). **Factors like having family ties, friends, colleagues or professional relations with people in Maryland would not weigh in favor of qualifying, as he administered the Policy. Nor would he consider as a factor political activity, voting or active membership in a church, in Maryland.** Referring to these types of factors, he expounded:

[Y]ou're here for nine or ten months that you're going to school and you might want to join a lot of organizations. The petition doesn't ask that. There's nothing there. It wants to know where did you live and where did you work. That's what it's looking for; and why you are here.

When asked, "really it's what they're asking for in the petition that is considered when you render your opinion?" Smith replied, "That's what I use. I don't have anything else to go by, other than the information that the student supplies." According to Smith, very few of his decisions were reversed by the CRC.

### Testimony Of Thomas C. Day, Jr.

Mr. Day worked in the Records and Registration department for fifteen years, succeeding Mr. Smith as the Campus Classification Officer and Director of Records and Registration on July 1, 2002. His understanding of how to apply the post-*Frankel* Tuition Policy differed from Smith's.

My understanding of the change was that after the *Frankel* decision, if a person was deemed to be an out of state person and they had been living out of the state at the time they apply and/or they had no proven financial independence, that the idea of being in the State of Maryland primarily to go to school became an issue and if they could rebut that presumption, then they could still be determined to be a Maryland resident.

When asked how a student could rebut the presumption, Day explained:

**It can be a number of ways, a combination of different ways. They could be working, going to school part-time. I've seen people who have submitted things to me such as extensive volunteerism, membership in a religious organization, family ties here in the state,** I'm sure there are some other things. Those are the things that have basically been presented to me in the past.

In most cases, it's not one of those things, although it potentially could be a single one of those factors, but in most cases, it's a combination of those kind of things. (Emphasis added.)

Day said that "twice in the last month to month and a half," a student who failed to meet the income criteria was able to overcome the Financial Dependence Presumption. He acknowledged that before that, "[i]t's not an extremely high number."

When the Students' counsel asked Day why a student-applicant's income is considered in determining his or her residency, Day said:

I'm looking in terms of the judgment call. I'm looking to try to determine whether the student is doing other things besides being a student and if they happen to be working, that can be a contributing factor to things that they're doing that's not being a student.

Nevertheless, Day made it clear that Conditions 2 through 9 could not rebut the financial dependence presumption. He explained that Conditions 2 through 9 would not rebut either of the presumptions described above because "these things are specifically listed in the [P]olicy as having been met." He also asserted that, in computing whether a student earned more than 50% of his expenses in order to avoid the Financial Dependence Presumption, the tuition at UM must be included as an expense.

Contrary to Smith, Day testified, as indicated above, that factors such as volunteerism, active church membership, and employment would be considered favorably in assessing residency.[9] He acknowledged that these criteria were not published or written down anywhere. Nevertheless, he asserted that when he interviewed a petitioner who could not meet the income requirements, he would ask about volunteerism and activities "outside of being a student." When Day reconsidered Bergmann's petition on 2003 (after the Board decided, mid-litigation, that the wrong criteria had been applied), he wrote to the CRC:

> In my judgment, the information submitted by Ms. Bergmann and the additional information submitted by Ms. Cobb did not rebut the presumption that Ms. Bergmann was at that time in the State of Maryland primarily to go to school. Specifically Ms. Bergmann's activities and/or community involvement during her first year of Law School were minimal and connected to her status as a Law student.

Day offered no explanation of why law-related community involvement would not qualify as evidence to rebut the Finan-

---

9. Marriage to a Maryland resident would also weigh in favor of residency.

cial Dependence Presumption or the Residence at Application Presumption.

The Board's Answers to Interrogatories also stated that there is no list of the factors that can be used to rebut the Application at Residence Presumption or the Financial Dependence Presumption.

### Patricia M. Sokolove

During all periods pertinent to these Students, Sokolove was the Assistant Vice President for Student Affairs at University of Maryland, Baltimore.[10] She also chaired the CRC, which "is made up of a group of ... four or five senior deans[.]" When asked how the *Frankel* decision "impact[ed]" the way that the committee decided appeals and residency classification," her answer was unclear.

I wouldn't say that it changed the way, what we did. Our feeling was that we looked at what Mr. Smith [sic], his decision, and looked to see whether his decision matched what the written policy said and whether the supporting documentation supported his decision.

Another of her responses suggested that her view of the post-*Frankel* Policy differed from that held by Day, and was more similar to Smith's:

Q: [I]f an individual failed the [Financial Dependence Presumption] could that be the sole reason why your committee would decline to give that student in-state status?

A: Yes, it could, just as if they didn't have a driver's license from the State of Maryland and had one from some other state.

When asked what guidance she received about the revised Policy, she replied, said, "[a]ctually, I think the committee just dealt with the policies themselves." Sokolove further explained that "after *Frankel* we were more careful to look at all

---

**10.** In that capacity, she was responsible for overseeing the counseling center, records and registration, student services center, financial aid, and the athletic center.

nine of those criteria more equally." Regarding a student's activities, such as active membership in a church, active community participation, or running for a public office, she said that these "would have no effect on" her decision as to residency.[11] She advised that "[b]etween 70 and 80 percent of the time we agreed with Mr. Smith and 20 percent of the time" we overruled him.

With respect to Bergmann, Sokolove testified that the only reason Bergmann was denied in 2001 is that "she was attending high school or residing outside of Maryland when she applied." She "guess[ed]" that the CRC also denied her petition because they "felt she" fell within the Financial Dependency Presumption.[12] Although Bergmann was financially independent (under section E(2) of Policy), she "did not provide half of her expense but neither did any other person[,]" as "all of her support comes from grants and loans." Regarding section E(2)(b) presumption of non-residency if she "is financially dependent upon a person not a resident of Maryland," Sokolove stated: "I wouldn't say she exactly met it, but I wouldn't say she didn't meet it either."

### Deposition Of David Nevins, Board of Regents Member

David Nevins, who was a member of the Board of Regents and chair of its Finance Committee, explained the reason for the Tuition Policy:

The purpose of this policy of ... the State of Maryland ... [is to] subsidize our institution to the tune of nearly one billion dollars. That's operating cost alone. Additionally billions of dollars in capital costs. So we want to make it such that students from out-of-state cannot fraudulently or otherwise represent themselves as in-state residents for the purpose of gaining discounted tuition.

---

11. She explained that she was speaking for herself, not for other members of the CRC.

12. Bergmann's petition showed that her total expenses were $30,130, of which $19,718 was tuition. She earned $2,771, received $1,000 as a gift, and relied on loans for the rest.

Nevins denied that the Board of Regents "intend[ed] any consistent set of criteria or mechanism by which a student could be judged to have rebutted the presumption[s]." Rather, he looked to the different schools within UM, and their administrators:

[W]e have generally found it to be appropriate not to establish policies that go to such a great degree as to restrict the differences among our institutions.... They all have professionally trained staffs that can, much better than we can, make these decisions.

Yet, in turn, the ultimate decision makers, professionals from various schools who constituted the CRC and made final decisions about application of the Tuition Policy, apparently saw no flexibility in how they applied the policy. Sokolove, Chair of the CRC, commented with respect to Bergmann's claim to the CRC that Smith was "inflexible," that "these are the rules. It's not Mr. Smith's call.... [I]t's the Board of Regents' definitions, not the university's. Not the campus's."

## DISCUSSION

## I and II.

### Judicial Review Of Tuition Classification Decisions

■■ The threshold debate in this appeal is whether the circuit court must treat a challenge to UM's denial of in-state tuition as "de novo" litigation, as the Students posit, or as judicial review of an administrative decision,[13] as UM contends.

The circuit court granted summary judgment to UM on the ground that its "denials of the [reclassification] petitions are

---

13. Challenges to administrative adjudications are not "appeals." Despite the common use of that term to describe judicial review of administrative decisions, the circuit court is actually exercising original jurisdiction. *See generally* Arnold Rochvarg, *Maryland Administrative Law* § 4.1 (MICPEL 2001)(discussing constitutional reasons that challenges to administrative actions cannot be taken directly to Maryland appellate courts).

supported by substantial evidence[.]" The Students argue that the deference shown by the circuit court to UM's tuition domicile decision was not appropriate because the General Assembly has made the Administrative Procedure Act inapplicable to UM in these circumstances. *See* Educ. § 12–104(j)(2)(except for appeals from employee grievances, "Title 10, Subtitles 1 and 2 of the State Government Article ("Administrative Procedure Act") are not applicable to the University"). Because the domicile finding involves "core issues of intent," and the evidence supports "divergent conclusions[,]" the Students contend that there were disputes of material fact that the court should not have resolved in UM's favor on summary judgment.

UM characterizes the Students' standard of review challenge as a red herring. It argues that, because the facts offered to show the domiciliary intent of each student were not disputed, "the issue on appeal is whether the trial court's rulings on the law were legally correct." The answer, it submits, is yes.

 What must be decided when a student challenges UM's denial of in-state tuition in court is not addressed by statute or regulation. Nor has any Maryland case yet articulated the standard for such review of UM's tuition domicile determinations. We shall hold that UM's tuition domicile decisions are subject to judicial review on the same common law grounds as other administrative decisions.[14]

---

**14.** Writing for this Court, Judge Rodowsky summarized the standards governing review of administrative decisions:

"A distinction is drawn in the scope of review depending upon whether the court is reviewing an administrative agency's findings of fact as opposed to purely legal conclusions. 'To the extent the issues on appeal turn on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test.' " ...

In contrast, "[d]etermining whether an agency's 'conclusions of law' are correct is always, on judicial review, the court's prerogative, although we ordinarily respect the agency's expertise and give weight to its interpretation of a statute that it administers." Further, an arbitrary and capricious standard applies to our review of an agency's discretionary functions, making such actions essentially unre-

The statutory framework governing the University makes it clear that UM's tuition domicile decisions are administrative adjudications by a State instrumentality. In Article 12, Subtitle 1 of the Education Article, the General Assembly declared that UM is "an instrumentality of the State," which operates as "an independent unit of State government" in performing "an essential public function[.]" Educ. § 12–102(a)(2)–(4). It created the Board of Regents to serve as UM's governing body. *See* Educ. § 12–102(b)("The government of the University System of Maryland is vested in the Board of Regents"). The Board

> [i]s responsible for the management of the University System ... and has all the powers, rights, and privileges that go with that responsibility, including the power to conduct or maintain any institutions, schools, or departments in the University....

Educ. § 12–104(c)(1). Consequently, UM is a State instrumentality and the Board acts as its administrator with respect to the governance matters entrusted to the University. *See* Educ. § 12–102(a)(2)–(4).

In the exercise of its statutory authority, the Board "may make rules and regulations and prescribe policies and procedures, for the management, maintenance, [and] operation ... of the University System[.]" Educ. § 12–104(j)(1). Among the management powers conferred upon the Board is the authority to establish tuition policy and rates. In *Frankel v. Bd. of Regents of Univ. of Md. Sys.*, 361 Md. 298, 317, 761 A.2d 324 (2000), the Court of Appeals recognized that one of the essential tools employed by the Board to advance UM's mission of educating Maryland students is to offer *bona fide* Maryland residents a substantially lower tuition rate than students from other jurisdictions.

---

viewable "[a]s long as [the agency's] exercise of discretion does not violate regulations, statutes, common law principles, due process and other constitutional requirements[.]"
*Dep't of Public Safety & Correctional Servs. v. Thomas*, 158 Md.App. 540, 551–52, 857 A.2d 638 (2004) (citations omitted).

Decisions regarding whether individual students qualify for the lower in-state tuition rate are made by the Board via policies and procedures established by the Board.[15] Through this process, UM determines domicile for all students who apply for the in-state tuition rate, including those who petition for reclassification. As we explained above, in order to implement its tuition differential policy, the Board also created an administrative process for considering such reclassification petitions.

In *Frankel,* the Court of Appeals recognized that UM's policies and practices governing determination of tuition domicile must comply with the constitutional requirements of equal protection and due process. *See Frankel,* 361 Md. at 313–15, 761 A.2d 324. But neither *Frankel* nor any other Maryland decision has explicitly addressed how courts should treat challenges to UM's domicile determinations.

Courts in other jurisdictions that have considered similar questions regarding state universities uniformly have held that the university's decisions regarding student domicile for tuition purposes are administrative decisions that must be judicially reviewed under the deferent standard that applies to review of administrative adjudications. *See Webster v. State Bd. of Regents,* 123 Ariz. 363, 599 P.2d 816, 818 (Ct.App. 1979)(to overturn a university's tuition domicile decision, "the trial court must find that the agency has acted arbitrarily, capriciously, or has abused its discretion"); *Allen v. Scherer,* 452 N.E.2d 1031, 1035 (Ind.Ct.App.1983)(when evidence regarding tuition domicile "could reasonably have given rise to two different inferences, the inference chosen by the agency must be sustained even though the court might have chosen a different inference"); *Peck v. Univ. Residence Comm. of Kansas State Univ.,* 248 Kan. 450, 807 P.2d 652, 660 (1991)(judicial review of tuition domicile decision is limited to determining whether the decision was "unreasonable, arbitrary or capricious"); *Norman v. Cameron,* 127 N.C.App. 44, 488

---

15. We shall closely examine these in the next section of our opinion.

S.E.2d 297, 300, *review denied,* 347 N.C. 398, 347 N.D. 401, 494 S.E.2d 416 (N.C.1997)(tuition domicile decision must be upheld if supported by substantial evidence); *Ravindranathan v. Va. Commonwealth Univ.,* 258 Va. 269, 519 S.E.2d 618, 620 (1999)(university's denial of in-state tuition was supported by substantial evidence and was not unreasonable).[16] These courts and litigants proceeded under their respective state APAs.

A New Jersey case, however, applied common law in reaching the same result. In *Lipman v. Rutgers–The State Univ. of N.J.,* 329 N.J.Super. 433, 748 A.2d 142, 146–47 (App.Div. 2000), the rationale for a deferent standard of review is persuasively articulated. As in this case, the state Administrative Procedure Act did not apply. The Appellate Division of the New Jersey Superior Court observed that, although "[t]he University is not a State agency under the Administrative Procedure Act[,]" it "has long been considered an instrumentality of the State for the purpose of providing public higher education, and whose property and assets are impressed with a public trust for that purpose." *Id.* at 147. As a result, "[w]hen Rutgers attempts to determine whether a student is domiciled in New Jersey, it acts much like an administrative agency." *Id.* at 146.

The appellate court concluded that the proper standard for judicial review of a tuition domicile decision by the university is the deferent standard that courts routinely apply to administrative decisions.

> [U]niversities are entitled to deference in some of their internal decisions.... We recognize that "[d]omicile is a relation which the law creates between an individual and a particular locality or country." Obviously, our courts have substantial experience dealing with this legal concept.
>
> However, [the university] makes an initial domicile determination for each student admitted to the University.

---

**16.** The Students have cited no cases, in or out of Maryland, that support their contention that a jury should resolve the factual disputes relevant to this tuition decision.

Thus, [the university] makes thousands of domicile determinations every year. These decisions are mixed questions of law and fact. When a university determines domicile, aside from the applicable law, the university must also confront its students' living arrangements, off-campus activities, and interaction with the school, as well as its own tuition policies. Therefore, a substantial portion of the domicile evaluation involves assessing factors that are uniquely within [the university's] expertise and, in our opinion, warrant deference by the judiciary.

*Id.* at 147–48 (citations omitted).

We agree with this reasoning. Deference to the statutory authority that the General Assembly has given the Board over tuition policy is appropriate when a circuit or appellate court is asked to reconsider a tuition domicile determination by the Board. UM possesses not only statutory authority, but also expertise in the unique determination of whether a particular student is domiciled in Maryland for the purpose of obtaining a higher education.

█ We are not persuaded otherwise by the exclusion of UM from the Administrative Procedure Act (APA) under Educ. section 12–104(j)(2). The Students misunderstand the effect of this provision. The judicial review standards set forth in the APA merely codify the prevailing common law standards governing judicial review of all administrative decisions. *See, e.g., Harvey v. Marshall,* 389 Md. 243, 296, 884 A.2d 1171 (2005)("Maryland cases suggest that 'an administrative proceeding, even if not subject to judicial review under the APA, would be subject to judicial review, of essentially the same scope, in an action for judgment' "); *Prince George's County v. Beretta U.S.A. Corp.,* 358 Md. 166, 176 n. 3, 747 A.2d 647 (2000)(when an adjudicative administrative decision is reviewable under common law rather than the APA, "essentially the same criteria set forth [in the APA] govern[s]")(citing cases). Thus, "[w]hen a court reviews an administrative decision that is not covered by the APA, judicial review is essentially identical to when the court is reviewing a decision

of any agency covered by the APA, absent a special statute to the contrary." Arnold Rochvarg, *Maryland Administrative Law* § 4.43, at 136 (MICPEL 2001). There are many administrative decisions that are subject to this type of judicial review. *See Beretta U.S.A.*, 358 Md. at 176 n. 3, 747 A.2d 647 (listing examples). To that list, we now add tuition domicile decisions by the University.

■ We hold that UM's domicile determinations, when made to determine appropriate tuition charges for its students, are properly reviewed under the established principles governing judicial review of administrative decisions.[17] Whether a particular student is domiciled in Maryland is a mixed question of law and fact that may be challenged on the same grounds as other administrative adjudications.[18] Ac-

---

**17.** This does not mean, however, that the Students necessarily had to file a petition for judicial review, as is required for judicial review under section 10–222 of the APA. Nor are the timeliness and procedural requirements of Md. Rules 7–202 through 7–209, governing judicial review under the APA, applicable here. Although this issue was not raised in *Frankel*, nor is it raised here, we note that the the Students here filed suit on theories of recovery that are similar, if not identical, to those successfully pursued by the plaintiff in *Frankel*. The Court of Appeals in *Frankel*, in the context of discussing UM's asserted waiver and sovereign immunity defenses, held that Mr. Frankel's remedy was a common law contract action against UM, grounded upon the Board's adoption of a "Policy and regulations entitling a student to a credit or refund of tuition upon re-classification from out-of-state status to in-state status." *Frankel*, 361 Md. at 309, 761 A.2d 324. *See also Stern v. Bd. of Regents, Univ. Sys. of Md.*, 380 Md. 691, 709–10, 718, 846 A.2d 996 (2004)(interpreting *Frankel* decision and distinguishing its holding that Frankel's claim was not barred by sovereign immunity, in the context of student challenge to UM mid-year tuition increase). The *Frankel* Court also noted that Frankel "filed [his] action within a year from the final administrative decision denying his request for in-state status and his claim for a refund." *Frankel*, 361 Md. at 308, 761 A.2d 324. The record is clear that Bergmann's suit was also filed within a year from the final administrative decision denying her request for in-state status and for a refund.

**18.** Specifically, a person aggrieved by the challenged residency classification must show that a substantial right has been prejudiced because the finding, conclusion, or decision:

 (i) is unconstitutional;

cordingly, the Students' claim that they are entitled to a jury trial on this issue must fail.

In this case, the circuit court's conclusion that there is substantial evidence to support UM's domicile decisions demonstrates that the court properly considered at least one of these grounds. The question remains, then, whether the University's tuition domicile decisions regarding the Students should be invalidated on other grounds, such as unconstitutionality, arbitrariness, or capriciousness. We address these issues next.

## III.

### Violation Of The Maryland Declaration of Rights And The Holding In *Frankel*

The Students next contend that the Board's "tuition charge differential policy, on its face and as applied to [the Students'] petitions, violates [the Students'] substantive and procedural due process rights, as well as their rights to equal protection provided for by Maryland's Declaration of Rights." Although the Students assert generally that UM violated both their procedural and substantive due process rights, they focus on their equal protection argument and the Court of Appeals' decision in *Frankel,* which was decided on equal protection grounds. Because we conclude that the Board's application of its in-state tuition policy violated the Students' equal protection rights under the Maryland constitution as enunciated in *Frankel,* we, like the *Frankel* Court, find it unnecessary to address the Students' due process grounds.

---

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

Md.Code (1984, 2004 Repl.Vol., 2005 Cum.Supp.), § 10–222(h) of the State Government Article.

In their brief, the Students review in detail the manner in which various UM officials viewed and applied the Board's modified policy, adopted in response to the *Frankel* decision. They also highlight the testimony of the Board of Regents' designee, who said that the purpose of the policy was to make it "difficult for a student who comes from out-of-state to become eligible for in-state tuition." Based on this evidence, they advocate that the Board failed to "create a constitutionally permissible tuition policy, which is obvious upon a close examination of how the policy is interpreted by the Appellees and how it was actually administered by the University."

We agree that the absence of uniformity in the UM administrators' understanding of the current Tuition Policy, and the absence of standards or criteria for them to use in determining whether a student has successfully rebutted the Financial Dependence Presumption, violates the Students' rights to equal protection embodied in Article 24 of the Maryland Declaration of Rights, according to the dictates of *Frankel.*

### The Facial Validity Of The Policy

■ Article 24 of the Maryland Declaration of Rights states, in pertinent part, "[t]hat no man ought to be ... disseized of his freehold, liberties or privileges, ... or, in any manner, destroyed or deprived of his ... liberty or property, but by the Judgment of his peers, or by the Law of the land." "Although Article 24 does not contain an express equal protection clause, the concept of equal protection nevertheless is embodied in the Article." *Renko v. McLean,* 346 Md. 464, 482, 697 A.2d 468 (1997).

■ The Court of Appeals in *Frankel* recognized that, although federal notions of equal protection are persuasive in its analysis of Maryland's equal protection clause, the " 'federal and state guarantees of equal protection are 'obviously independent and capable of divergent application.' " *Frankel,* 361 Md. at 313, 761 A.2d 324 (citation omitted). The Court chose to rest its decision on the Maryland Declaration of Rights. *See id.* at 313 & n. 3, 761 A.2d 324.

In *Frankel*, the Court of Appeals was faced with a tuition policy different from that involved here. Under the former policy, a student could not "have in-state tuition status if more than one-half of the student's financial support [came] from a person or persons who live out-of-state. This requirement [was] absolute and ha[d] no exceptions." *Id.* at 314, 761 A.2d 324. The *Frankel* Court held that the policy violated Maryland's equal protection clause, because it "places in one class bona fide Maryland residents whose primary source of funds is within the State, and places in another, higher paying class, bona fide Maryland residents whose primary source of funds is outside the State." *Id.* at 314, 761 A.2d 324.

The Court of Appeals decided that UM's former tuition policy failed the classic "rational basis test," under which a discriminatory economic regulation, even if it does not impair fundamental rights, must have some "reasonable justification." *Id.* at 315, 761 A.2d 324. The Court called upon its decision in *Verzi v. Baltimore County*, 333 Md. 411, 635 A.2d 967 (1994), to demonstrate application of the rational basis test in the context of economic regulation:

> [W]e invalidated, under the equal protection component of Article 24, a Baltimore County regulation imposing a "location requirement" for licensed tow truck operators who are called by the police to tow vehicles which have become disabled. Under the regulation, whenever police in Baltimore County were requested to call a tow truck operator for a disabled vehicle, the police were required to call upon an operator whose place of business was located in Baltimore County.... Judge Karwacki stated for the Court [that] ... "we have ... required that a legislative classification rest upon 'some ground of difference having a fair and substantial relation to the object of the legislation.'"

*Frankel*, 361 Md. at 315–16, 761 A.2d 324 (citations omitted). The Court reasoned that

> a governmental regulation placing a greater burden on some Marylanders than on others based on geographical factors must rest on "some ground of difference having a fair and

substantial relation to the object of the regulation." The stated object of the Board's Policy is to allow bona fide Maryland residents to pay a lower tuition than nonresidents.... As the petitioner does not challenge the objective of according a reduced tuition benefit to bona fide Maryland residents, we shall assume that the Board's objective is entirely legitimate.[19] Nevertheless, the Board's absolute preclusion of resident status for any student whose primary source of monetary support resides out-of-state has no "fair and substantial relation to" the Board's and Policy's objective. On the contrary, many applications of the Policy will be inconsistent with the objective of providing a tuition benefit to bona fide Maryland residents.

*Id.* at 317, 761 A.2d 324 (citations omitted).

The Court gave two hypothetical examples of situations in which equal protection would be unconstitutionally denied: (1) a student always lived in Maryland with his parents until, shortly before applying to UM, his parents divorced, and the parent with the economic means to pay for college moved out of state; and (2) a student and his parents always lived in Maryland, but the student's expenses while in college were paid for by the student's grandparent, who resided in another state. *See id.* at 317–18, 761 A.2d 324. Noting that the Board took the position that, in these hypothetical examples, the student **must** pay out-of-state tuition, the Court of Appeals held that "the Board's and the Policy's use of 'financial dependence' and 'financial independence' creates an arbitrary and irrational classification which violates the equal protection principal" under Maryland law. *Id.* at 318, 761 A.2d 324. The Court directed the Board to determine Frankel's residency classification without using the "financial dependence" and "financial independence" factors, according to eight domicile factors listed in the pre-*Frankel* policy. *See id.* These eight domicile factors are substantially the same as Conditions 2 through 9 of the current Tuition Policy, which was revised after *Frankel.*

---

19. We make the same assumption here.

The current Policy differs from the pre-*Frankel* policy in that now, according to the terms of the Policy, the Financial Dependence Presumption **may be rebutted by the student.** Previously it could not. The *Frankel* Court did not address whether the Board could use a rebuttable presumption of non-residency flowing from proof of the student's financial dependency on an out-of-state resident.

The Court, however, held out the prospect that the source of a student's support might be a factor to consider, and the Court's words could be read to mean that this factor might be given greater weight than other factors:

> **Our holding in this case does not necessarily preclude the Board in the future from adopting a regulation or amending the Policy to make the source of student's financial support a factor,** among the other eight listed criteria, in determining whether a student is a bona fide resident of Maryland. There is a substantial difference between an absolute requirement and a mere factor which should be weighed and considered along with other factors. **Moreover, in determining legal residence or domicile, the weight that is given any particular factor may vary depending on the circumstances.**

*Id.* at 318 n. 4, 761 A.2d 324 (emphasis added). Thus, in examining the validity of the Policy, we must decide (1) whether the source of a student's financial support can legitimately be considered as a factor in deciding the student's permanent residence; and (2) whether the Board gave this factor too much weight when it applied the Financial Dependence Presumption.

In answering the first question, we use a similar test to that applied in *Frankel, i.e.,* whether the source of a student's financial support has " 'a fair and substantial relation to" a determination of the student's permanent residence.' " *Id.* at 316, 761 A.2d 324. We hold that the source of a student's monetary support does have a "fair and substantial relation to" the question of his or her residence. It may be

one of several factors considered in determining whether the student is a permanent resident of Maryland.

 In reaching this conclusion, we examine the concept of permanent residency, and how that concept was defined by the *Frankel* Court. Traditionally, for constitutional purposes, residency "means *a place of fixed present domicile.*'" *Blount v. Boston,* 351 Md. 360, 366, 718 A.2d 1111 (1998)(quoting *Howard v. Skinner,* 87 Md. 556, 559, 40 A. 379 (1898))(emphasis added). Although easily stated, the term "fixed, present domicile" is an elusive concept,

> and there is no single definition of the term which will mechanically determine each person's domicile once the pertinent facts are known. One's domicile "has been defined as the place 'with which he has a settled connection for legal purposes[.]' It has also been defined, in the same judicial opinions, "as that place where a man has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which he has, whenever ... absent, the intention of returning."
>
> In addition, domicile has been defined as the place that is "the 'centre of [a person's] affairs,' and the place where the business of his life [is] transacted." A person's domicile is ordinarily "where he and his family habitually dwell[.]" One claiming a particular place as his domicile "identifies himself and all his interests" with the place and there "exercises the rights and performs the duties of a citizen.' Although a person may have several places of abode or dwelling, he or she 'can have only one domicile at a time.'"

*Id.* at 367, 718 A.2d 1111 (citations omitted).

 The definition of domicile is not rigid, and the criteria can be molded to meet special circumstances:

> This Court has never deemed any single circumstance conclusive. *However, it has viewed certain factors as more important than others, the two most important being where a person actually lives and where he votes.* ... Where these factors are not so clear, however, or where there are

special circumstances explaining a particular place of abode or place of voting, the Court will look to and weigh a number of other factors in deciding a person's domicile." **... In other words, the law presumes that where a person actually lives and votes is that person's domicile, unless special circumstances explain and rebut the presumption.**

*Oglesby v. Williams*, 372 Md. 360, 373–74, 812 A.2d 1061 (2002) (citations omitted and bold added).

All the Students physically spent their time in Maryland while attending UM, and satisfied many of the other traditional domicile factors. Mr. Frankel also qualified under most traditional factors. But the Board argued to the *Frankel* Court that residency decisions involving university students involved special circumstances. Specifically, the Board contended that, "in a determination of in-state status for tuition purposes, financial dependency on out-of-state sources is 'far more probative' than other, more common, residency factors, such as where one votes and files income tax returns." *Frankel*, 361 Md. at 312, 761 A.2d 324.

Although the *Frankel* Court never directly answered this argument, it clearly declared that traditional criteria for residency should apply to university students:

A student who is a Maryland resident **under any legal meaning or ordinary usage of the term "resident,"** but whose chief source of monetary support is someone out-of-state, will, under the Policy, be deemed a nonresident of Maryland and will be required to pay a greater tuition than other Marylanders. Therefore the Policy, *inter alia,* places in one class bona fide Maryland residents whose primary source of funds is within the State, and places in another, higher paying class, bona fide Maryland residents whose primary source of funds is outside the State.

*Id.* at 314, 761 A.2d 324 (emphasis added). In other words, the Court of Appeals told the Board that UM **could not create its own definition of residency for tuition classification purposes that was not generally grounded in the**

**traditional legal standards.** The Court of Appeals considers "domicile [to be] a unitary concept; the 'meaning of domicile and the basic principles for determining domicile have been the same in this State regardless of the context in which the issue of domicile arose.'" *Blount,* 351 Md. at 367, 718 A.2d 1111 (citations omitted)(cited in *Frankel* ).

The Court of Appeals has also identified specific facts that could be considered:

Typically, [a Marylander] has only one place of abode which is designated as his or her residence for virtually all purposes, such as voting, income tax returns, driver's license, motor vehicle registration, school attendance, receipt of mail, banking, contracts and legal documents, the keeping of personal belongings, membership in organizations, *etc.*

*Id.* As we construe the *Frankel* opinion, the Court did not say that the Board's definition had to be *exactly* like the traditional legal definition, but left for future decisions how close it had to be.

In this case, all of the traditional domicile factors recited in *Frankel* (quoted above) have been met by the Students. Yet, in our view, this situation does present special circumstances that justify adjustment of these traditional factors.

First, students who seek reclassification, including appellants here, have a reason to come to this State: attendance at UM. They all moved to Maryland around the time of their matriculation at UM, suggesting that they came to Maryland for the education, and may well intend to leave the State after graduation. Because of their matriculation at UM, the attainment of Maryland domicile entitles them to large and immediate savings in the form of tuition reductions.[20] This means

---

**20.** For example, the difference between in-state tuition and out-of-state tuition for full time day students at UM School of Law in 2001–2002 was $4,473.50, a significant amount for a person who has not yet begun a professional career. The same differential for 2002–2003 was $10,742. The full time day student tuition increased from $5,402 (resident) and $9,875.50 (non-resident) in the 2001–2002 school year, to $11,547 (resident) and $22,289 (non-resident) in the 2002–2003 school year.

that they have a sharp incentive to satisfy most of the traditional domicile criteria, the cost of which will be dwarfed by the tuition savings. For the typical student in professional school, obtaining a Maryland driver's license and motor vehicle registration, registering to vote and voting, moving personalty, and renting living quarters are relatively easy things to do, when compared to earning $4,000 to $10,000, representing the tuition savings possible for a Maryland resident.

When the financial incentive to meet these easily satisfied criteria is high, regardless of whether a student intends to permanently reside in Maryland, a more careful scrutiny of the student's true intent is constitutionally justified. Moreover, as the *Frankel* Court recognized, "[t]he difficult and close cases arise with respect to those persons who have more than one place of abode **or who have other significant contacts with more than one place.**" *Id.* at 368, 718 A.2d 1111. In our view, receipt of more than 50% of a student's support from an out-of-state person constitutes a significant contact with another state.

It is more difficult to say that " 'the centre of [a student's] affairs,' and the place where the business of his life [is] transacted" is in Maryland, when the crucial matter of his support is tied to another state. *See Thompson v. Warner,* 83 Md. 14, 20, 34 A. 830 (1896)(quoted in *Blount,* 351 Md. at 367, 718 A.2d 1111). Conversely, when a student earns money in Maryland, the student has an additional connection to the State. The nature, stability, and opportunity offered by a job will tend to promote a person's desire and need to live in the state where the job is located. Thus, earning money in Maryland is an appropriate indicator of a student's intent to maintain Maryland as his or her permanent residence.

Second, the traditional domicile rules rely on actual presence in the State as one of the two most important criteria. *See Blount,* 351 Md. at 371, 718 A.2d 1111. When a person lives in this State because he has to be here to obtain an education, however, his physical presence does not carry the same weight because there is a fixed date when attendance at

the school will terminate. Consequently, other measurements are needed.

For these reasons, when a student states on her application to UM that she is a resident of another state, and then relies on a person from out of state for more than 50% of her support during her first academic year, a rebuttable presumption that the student is not domiciled in Maryland has "a fair and substantial relation to the object of the Policy," which is to qualify only those students who are permanent residents of Maryland for the lower in-state tuition rates.

 We also conclude that the Residence At Application Presumption is valid. We do so for the simple reason that this Presumption, self-evidently, only applies to students who were non-residents when they applied to UM. It is settled Maryland law that "[o]nce a domicile is determined or established a person retains his domicile at such place unless the evidence affirmatively shows an abandonment of that domicile." *Oglesby*, 372 Md. at 373, 812 A.2d 1061. In other words, once domicile is established, there is a presumption that it continues until superseded by new domicile. *See Blount*, 351 Md. at 371, 718 A.2d 1111. The Residence At Application Presumption imposes no more burden on a student than traditional domicile law.

Nor do we agree with the Students that, in these special circumstances, a student **necessarily** passes the residency test when he meets Conditions 2 through 9, but not Condition 1 (*i.e.*, that a student must not be "residing in Maryland primarily to attend an educational institution"). Condition 1 belongs in a category by itself because it simply expresses the Board's ultimate objective to disqualify students for in-state tuition if they are physically present in the State primarily for their education. We do not read *Frankel* to mean that this objective is constitutionally improper. If a student is in the State primarily for his education, it is reasonable to conclude that he is not a permanent resident. A student's satisfaction of the

readily attainable Conditions 2 through 9 does not compel us to infer otherwise.[21]

### Revised Policy's Constitutionality As Applied

■ The Students also challenge UM's *application* of the current Tuition Policy, arguing that although the Policy language was revised, the administrators' application remained the same, *i.e.*, they continued to apply the Financial Dependence Presumption **as if it were irrebuttable.** This, the Students argue, violates the *Frankel* mandate, and the equal protection law that is implicit in the Maryland Declaration of Rights. Additionally, the Students argue, UM administrators were unconstitutionally arbitrary and capricious in their decision making, allowing some students re-classification, and denying others, with no consistent criteria applied to justify those decisions. Our review of the record persuades us that the Students are correct. For the reasons set forth below, we will vacate the circuit's court order granting summary judgment in favor of the Board.

Mr. Smith, Campus Classification Officer until July 1, 2002, made the initial decision to deny each of the Students' petitions for reclassification. Rather than treating the Financial Dependence Presumption as rebuttable, Smith made it perfectly clear that it was still irrebuttable. Smith also acknowledged that, as he administered the Policy, factors like family ties, friends, colleagues or professional relations with people in

---

**21.** The Policy on its face requires that a student qualify under each and every condition listed as items 1 through 9 in Part I, subpart A. Domicile law, however, traditionally required a weighing of multiple factors. *See Oglesby*, 372 Md. at 373–75, 812 A.2d 1061; *Blount*, 351 Md. at 367–71, 718 A.2d 1111; *Bainum*, 272 Md. at 497–99, 325 A.2d 392. The *Frankel* Court, in recognizing that the source of a student's financial support might be considered in a revised policy, was careful to enunciate simultaneously the "substantial difference between an absolute requirement and a mere factor which would be weighed and considered along with other factors." *Frankel*, 361 Md. at 318 n. 4, 761 A.2d 324. We do not know whether the Court intended that the Board cannot make conditions 2 through 9 mandatory for qualification as an in-state student. Because all of the Students in this case met conditions 2 through 9 however, that issue is not presented in this appeal.

Maryland would not be considered to rebut the Financial Dependence Presumption. Nor would he consider as a factor political activity, voting, or active membership in a church in Maryland. As he viewed the Policy, a petition for reclassification "wants to know where did you live and where did you work. That's what it's looking for; and why you are here."

Indeed, as we indicated before, Smith testified that students who cannot demonstrate that they are earning enough money to be self-sufficient would find it impossible to rebut the presumption:

Q. [Conditions] [t]wo through nine that we discussed, but they cannot demonstrate [Maryland residency], because they're not employed or they're not employed and making enough money to be self-sufficient, and they cannot demonstrate their self-sufficiency and they're relying on a parent who is out of state, is there any way that that type of student could establish residency?

A. Not under those circumstances in my judgment, no.

This statement could not be plainer. Although we have decided that financial dependence on an out-of-state person can be given greater weight for tuition classification purposes than some of the traditional domicile factors, Smith's application of the Policy rendered the Financial Dependence Presumption irrebuttable, a practice definitively outlawed in *Frankel*. Undisputably, there was an unconstitutional application of the revised Policy after the *Frankel* decision.

The CRC had an opportunity to cure Smith's unconstitutional decisions by overruling them. But it failed to do so. Instead, the CRC sent Bergmann what appeared to be a form letter simply saying that she "failed to convince the committee that ... she was not residing in [Maryland] primarily to attend an educational institution." The letter contained no reference to her summer employment, her lobbying of the Maryland legislature, or her membership in Maryland legal groups. Indeed, Sokolove, the Chair of the CRC, testified that Bergmann was denied reclassification in 2001 because of the Residence at Application Presumption and the Financial

Dependency Presumption. This decision was made despite Bergmann's actual financial independence; she obtained her tuition and living expenses from her summer employment, combined with grants and loans.

Speaking generally, Sokolove testified that if a student "failed the financial independence/dependence test or policy," that could be "the sole reason why [the CRC] would decline to give that student in-state status[.]" She acknowledged that neither active church membership, community participation, nor running for office would affect her decision about a student's residency. Thus, the CRC admittedly applied the same unconstitutional irrebuttable presumption that Smith did. *See Frankel,* 361 Md. at 318, 761 A.2d 324.

Smith's successor, Day, had a different understanding of the Policy from that of Smith and Sokolove. His interpretation was more consistent with the dictates of *Frankel.* In contrast to Smith and Sokolove, he testified in deposition that factors such as volunteerism, active church membership, and employment would be favorably considered in rebutting the Financial Dependence Presumption. But there is no evidence as to *when* Day's view was applied, or that it ever became a consistent and prevailing interpretation of the Policy. Moreover, Day conceded that these potential rebuttal factors are not published anywhere, or even written down. He asserted that he tells students about these factors when he meets with them.

So, we have a post-litigation claim of adjustment to a Tuition Policy (as announced in September 2003) that has been unconstitutionally applied during the period from the *Frankel* decision in 2000 until at least Sokolove's chairmanship of the CRC ended in the summer of 2002. The Board has presented no evidence of **when** the change in interpretation or application occurred, and it has never issued or announced any standards or criteria for how the Financial Dependence Presumption can be rebutted.

*Pierce on Administrative Law* explains why an administrative agency needs standards or criteria in its decision-making:

An agency whose powers are not limited either by meaningful statutory standards or by legislative rules poses a serious potential threat to liberty and to democracy. In the absence of other limits on its power, such an agency can engage in patterns of adjudicatory decisionmaking that are based on corruption, personal favoritism or animosity, or political favoritism or animosity, with little risk of detection.

II *Pierce, supra,* § 11.5, at 815. Although the cases do not declare a hard and fast rule that written criteria must be set forth to define every term in a policy established by an agency, we hold that, under these circumstances, it is necessary that the Board further define, in writing, the factors that will be considered sufficient to rebut the Financial Dependence Presumption, and apply them to all of the Students on remand.

 In reaching this decision, we consider the apparent confusion by the Campus Classification Officers and the CRC about how to administer the Policy after *Frankel.* We also have considered the nature of what must be factually rebutted once the Presumption is applied (*i.e.,* that a student's primary purpose for living in Maryland is not to attend school). When, as in this situation, the fact to be proven is an individual's state of mind regarding future plans, there is substantial risk that administrative decisionmakers who are not constrained by statute, regulation, or established policy, will "ignore relevant considerations or take into account irrelevant considerations[,]" either of which may result in an arbitrary and capricious decision. *See Rochvarg, supra,* § 4.38, at 129; *see generally Harvey v. Marshall,* 389 Md. 243, 298, 884 A.2d 1171 (2005)(recognizing that "deliberate disregard of . . . relevant evidence" may render a decision capricious).

The Board's mid-litigation reconsideration of Ms. Bergmann's petition does not change our decision. Eleven months after Bergmann's complaint was filed, the Board's attorney wrote to Bergmann's attorney, stating that the "Board's post-*Frankel* policy . . . was misapplied to Ms. Bergmann's petition," and announcing the Board's intention to review it again,

"using a correct interpretation." The Board did not state what **incorrect** interpretation had been applied, or whether this decision to reconsider involved a shift in policy. Nor did the Board provide any list or description of factors that would be considered to determine whether the Financial Dependence Presumption had been rebutted.

Yet when the CRC reconsidered Bergmann's petition, they faulted her, *inter alia,* for not providing "any documentation or affidavit from a friend or colleague of Ms. Bergmann's which provided any credible support that she had relocated to Maryland for any purpose other than to attend law school." The Board had never said that an affidavit from a friend or colleague regarding a student's true intent in moving to Maryland would be considered. Moreover, doing so was inconsistent with the administrators' statements about the type of evidence that could rebut the Financial Dependence Presumption. This ruling by the CRC is an example of how the failure to offer standards or criteria results in arbitrary decision-making.[22]

The CRC went on to say that "the file showed no record of community involvement in Maryland beyond her Law School activities." Yet Bergmann's activities included lobbying the General Assembly, membership in the Maryland organization Freestate Justice, holding office with the Maryland Public Interest Law Project, and the Maryland Environmental Law Society. We fail to see how law-related community involvement is less probative than non-law related involvement for purposes of determining the student's intent to relocate to Maryland. It is predictable that a person who is studying to enter a particular profession is likely to choose professionally related community activities. Indeed, such activities tend to increase the likelihood of staying after graduation, at least when not mandated by or offered through the professional

---

22. Nor could the CRC decide, as it did, that contrary to Bergmann's affidavit, she did not move all her personalty to her dorm room in Maryland, without any evidence to the contrary and when the CRC did not even interview her to determine her credibility.

school. On remand, professionally related community activities must be considered by UM in making its domicile determinations.

Finally, we agree with the Students that the administrators' interpretation of what constitutes financial dependence and independence under the Policy violates the reasonable relationship test. Under the terms of the revised Policy, "self-generated income" does not include educational grants and loans for purposes of meeting the requirement that the student generate more than one half of his support, which in turn is necessary to avoid being classified as financially dependent and thereby triggering the presumption against Maryland residency. Yet nowhere in the Policy, or any applicable statute, regulation, or rule, do we find a definition of "expenses." Day testified that, as he and others consistently applied the Policy, expenses are defined to include the cost of tuition. This is also apparent on the face of the reclassification petition forms created by UM.

Thus, as Bergmann complained to Smith and the CRC, students encounter "a 'catch–22' in that, as a full-time student nine months out of the year," they are highly unlikely to earn more than half of their yearly tuition plus living expenses. As long as UM mandates that tuition must be counted as a student expense, and the Policy continues to define self-generated income as excluding scholarships, grants, and loans, then an unacceptably large number of students who have established a bona fide Maryland domicile following their matriculation at UM will be unable to obtain reclassification.

As we stated in the previous section, the basis for our decision that the Financial Dependence Presumption is constitutionally permissible is that a student who receives support from a person in another state has significant ties to that state. But if a student receives the income necessary for her support from an educational loan, those extra-territorial ties disappear, as does the justification for the Financial Depen-

dence Presumption.[23] We hold that, when the Board uses the rebuttable Financial Dependence Presumption, it may not include tuition costs in expenses so long as the Policy remains that educational loans for the purpose of paying tuition are excluded from income. In other words, the amount of tuition at the particular UM school should not determine whether a student is considered a permanent resident of Maryland.

## IV.

### Denial Of Class Certification

Md. Rule 2–231(a) provides:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. Unless justice requires otherwise, an action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or . . .

---

**23.** This interpretation also means that the higher the tuition is, the harder it is to prove that a student intends to reside permanently in Maryland. This, too, may have constitutional implications.

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions, (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, (D) the difficulties likely to be encountered in the management of a class action.

 The procedure for determining whether these standards have been met is well established.

The party moving for class certification bears the burden of proving that the requirements for certification have been met. A court should accept the putative class representative plaintiffs' allegations as true in making its decision on class certification, and the determination may not be rested upon the merits of the underlying cause(s) of action, Nevertheless, "the court can go beyond the pleadings to the extent necessary to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.' "

*Philip Morris Inc. v. Angeletti,* 358 Md. 689, 726–27, 752 A.2d 200 (2000) (citations omitted).

 The circuit court concluded that the Students satisfied the numerosity (factor 1) and adequacy of representation (factor 4) requirements, but failed to establish commonality (factor 2) or typicality (factor 3).

The commonality requirement promotes "[c]onvenience, uniformity of decision, and judicial economy," because common issues are litigated "only once on behalf of all class members." The threshold of commonality is not a high one and is easily met in most cases. It "does not require that all, or even most issues be common, nor that common issues

predominate, but only that common issues exist." Although the standard for commonality varies among jurisdictions, a common articulation requires that the lawsuit exhibit a "common nucleus of operative facts."

*Id.* at 734, 752 A.2d 200 (citations omitted).

The typicality requirement seeks to make certain that "the representative part[ies] . . . be 'squarely aligned in interest' with the class members." It is also "intended to ensure that class representatives will represent the best interests of class members who take a less active part in managing the litigation." . . . "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims."

*Id.* at 737, 752 A.2d 200 (citations omitted).

Pointing to *Moreno v. Univ. of Md.,* 420 F.Supp. 541, 562 (D.Md.1976), in which the federal District Court for Maryland certified for class action claims by students challenging the constitutionality of UM's tuition charge differential policy, the Students argue that "[t]his case is one that is well suited for class action relief." They contend that the facts underlying their claims are sufficiently similar to the facts that would give rise to claims by other UM graduate students who have been classified as out-of-state students as a result of the Financial Dependence Presumption under the current Tuition Policy. In their view, the circuit court erred in concluding that class members' claims would "require a total re-examination of each student's residency petition because each student has met different domicile requirements." That is because "the class action complaint specifically defines the class as consisting of only those students who have met the eight domicile factors

and were denied a change in residency based on the first ... factor."

That conclusion is bolstered, the Students contend, by the benefits of consolidated litigation experienced by the Students in this action, which has yielded significant "efficiencies." The same benefits that presumably justified consolidation of these Students' claims also justify a class action for claims by similarly situated Maryland graduate students who have been denied in-state tuition reclassification under the Policy.

In light of our holding that the Financial Dependence Presumption aspect of the Tuition Policy does not pass constitutional muster, either on its face or as applied, we shall remand to the circuit court to reconsider whether class certification is warranted. We express no opinion on the merits of that decision, recognizing that it will require the court to "go beyond the pleadings to the extent necessary to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Philip Morris,* 358 Md. at 727, 752 A.2d 200.

## CONCLUSION

For the reasons set forth above, we vacate the summary judgment granted by the circuit court, and remand this case to the circuit court for further proceedings with the following directions.

♦ The circuit court must decide, in its discretion, and in light of this opinion and standards governing class actions, whether the Students' request for certification of a class should be granted.

♦ With respect to the four Students in this appeal (and, if the court decides to certify a class, any other similarly situated students who have been denied reclassification under the post-*Frankel* Tuition Policy), the court must determine whether monetary and/or injunctive relief is warranted. In *Frankel,* the Court of Appeals decided that "the petitioner [was] entitled to have his residency

classification determined by the University based on the eight 'domicile' criteria set forth in Part I, subpart A of the Policy, and without using the 'financial dependence' and 'financial independence' factors." *Frankel,* 361 Md. at [318] 334–35[, 761 A.2d 324]. That is a possible remedy here. There may be other appropriate remedies that are consistent with *Frankel* and our decision. But we defer to the circuit court to fashion those remedies, because they may be linked to the court's decision regarding class certification.

♦ The circuit court must grant declaratory and/or injunctive relief that will require the Board to modify its tuition reclassification policy and practices in a manner that is constitutionally permissible according to *Frankel* and this opinion, including, if the Financial Dependence Presumption continues to be used by the Board:

(a) creating standards or additional criteria to define what type of evidence will be considered in deciding whether the Financial Dependence Presumption has been rebutted, including therein a statement that community involvement may include professionally related activities;

(b) adopting a policy specifying that tuition costs will be counted as a student expense only to the extent tuition exceeds the amount of any educational scholarships, grants, or loans available to pay such tuition expenses.

**SUMMARY JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION, INCLUDING REMAND TO THE UNIVERSITY FOR FURTHER ACTIONS. COSTS TO BE PAID BY APPELLEES.**